[No. A043404. First Dist., Div. Five. Oct. 17, 1989.]

MOUNTAIN LION COALITION et al., Plaintiffs and Respondents,
v.
FISH AND GAME COMMISSION et al., Defendants and
Appellants.

**COUNSEL**

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, and Denis D. Smaage, Deputy Attorney General, for Defendants and Appellants.

Michael H. Remy, James G. Moose and Remy & Thomas for Plaintiffs and Respondents.

## Opinion

HANING, J.—The California Fish and Game Commission, et al.,[1] appeal from an order amending a peremptory writ of mandate directing them to comply with requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) in connection with the promulgation of regulations governing the sport hunting of California mountain lions.

In 1987 the commission adopted regulations that, for the first time in 16 years, allowed the sport hunting of mountain lions. The Mountain Lion Coalition and other organizations (collectively respondents) successfully petitioned the superior court for a peremptory writ of mandate suspending the hunt and requiring appellants to fulfill their obligations under CEQA. Specifically, appellants were directed that if they intended to authorize a mountain lion hunt, they would have to prepare and circulate an environmental impact document (EID) containing a legally sufficient analysis of the cumulative impact associated with conducting such a hunt. This appeal reviews the superior court's decision to suspend appellants' adoption of a regulation in 1988 authorizing a mountain lion hunt because the environmental documentation circulated for public review failed to comply with the terms of the superior court's writ of mandate.[2] We will conclude that appellants failed to comply with both the peremptory writ and with CEQA, and we will affirm.

### Facts and Procedural History

On April 10, 1987, appellants formally adopted hunting regulations allowing the sport killing of mountain lions during the fall of 1987. (See Fish & G. Code, § 207.) On May 13, 1987, respondents petitioned the superior court for a writ of mandate to set aside these regulations until a full EID was prepared. The petition alleged that appellants' proposal to allow a mountain lion hunt was highly controversial,[3] it involved uncertain effects

---

[1] Additional appellants are the individual commissioners, in their official capacities, and the Department of Fish and Game.

[2] Because the 1988 hunting season has expired, we have considered whether this appeal is moot. We have concluded, however, that the questions involved are of public importance, and likely to recur. (*Schraer* v. *Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 728 [255 Cal.Rptr. 453], and cases cited therein.) The Fish and Game Code establishes a unique procedure which requires that mammal hunting regulations be reviewed on a yearly basis. (Fish & G. Code, former § 211.) The short length of the hunting season would preclude appellate review if the end of each season was treated as rendering the appeal moot. Furthermore, both parties have indicated they want a decision hereon.

[3] By April 10, 1987, when appellants formally authorized the hunt, some 85,451 persons had sent in letters or signed petitions stating their opposition to the proposed mountain lion hunt. Objections were posed on a wide range of legal, ethical, religious and scientific grounds.

and unknown risks of dropping the mountain lion population below self-sustaining levels, and it could result in cumulatively significant impacts on the environment. The petition further alleged that appellants had failed to meet their obligation under CEQA to prepare and circulate a document addressing these issues before a hunt could be authorized.

On October 7, 1987, the superior court issued a peremptory writ of mandate suspending the regulations authorizing the 1987 mountain lion hunt. The court ruled that appellants had not complied with CEQA, in that they failed to consider the cumulative impacts on the environment if the hunt took place. The writ directed that if appellants decided to proceed with the hunt, they would have to prepare an analysis of cumulative impacts in accordance with CEQA, and circulate and receive public input on this analysis.[4]

One month later appellants filed a return to the peremptory writ claiming they had fully complied with the court's directive. Their four-page cumulative impact analysis concluded that the mountain lion hunt would have no adverse impacts on the mountain lion population as a whole, nor would it have a measurable negative impact on the mountain lion's habitat or other property or animals. This cumulative impact analysis had been circulated for public review, written comments had been received and evaluated, and appellants had adopted findings that the cumulative effects of the proposed hunt were insignificant. Appellants contended this brief statement satisfied their requirements under CEQA, and that they were entitled to proceed with the implementation of the 1987 mountain lion hunt.

Appellants' claim that they had fully satisfied the terms of the peremptory writ was immediately challenged by respondents, who stressed several major points in arguing that the cumulative impact analysis failed to meet CEQA requirements: Primarily, the cumulative impact analysis was attacked as lacking detail and specific references to concrete data supporting the conclusions reached. Appellants were also criticized for inadequately

---

Several scientists questioned the methodology that led the Fish and Game Department to conclude there were 5,100 mountain lions in California, in light of existing scientific data estimating the population to be far less. Concerns were expressed that the mountain lion population was already at risk because of the intense pressure for development in rural areas and illegal poaching, and the proposed hunt would only exacerbate the situation. Many people expressed repugnance at the notion of killing mountain lions for pure sport with no utilitarian function whatsoever—typically by tracking the target animal with dogs, running it up a tree, and then keeping it there until the license holder arrives to shoot it at point blank range.

[4] In ordering that the cumulative impact analysis would have to satisfy the requirements of CEQA, the superior court relied on our opinion in *Environmental Protection Information Center, Inc.* v. *Johnson* (1985) 170 Cal.App.3d 604, 616-620 [216 Cal.Rptr. 502]. In that case we held that agencies certified under Public Resources Code section 21080.5 must consider the cumulative impacts of their projects under CEQA. The parties do not take issue with this finding.

addressing or completely ignoring important issues that had been brought to their attention. For instance, letters had been sent to appellants on April 8, 1987, and November 10, 1987, from the National Park Service expressing concern that mountain lion hunting was being proposed in areas adjacent to several national parks. Since the national parks were under a mandate to protect the mountain lions within the parks, and it was likely mountain lions would roam outside the parks' boundaries, the National Park Service expressed concern that its goal of maintaining an unhunted and undisturbed mountain lion population would be compromised by the proposed hunt. The National Park Service registered its opposition to the proposed mountain lion hunt "due to the expected adverse impact to valued park resources." At a minimum, the National Park Service requested that buffer zones be created around park boundaries where no lion hunting would be permitted. Respondents pointed out that appellants had never contacted the National Park Service about these concerns and comments, and the cumulative impact analysis adopted by appellants failed to create buffer zones or address how the proposed hunt could potentially affect the mountain lion populations within the national parks.[5]

Respondents also claimed that appellants ignored pleas from scientists engaged in ongoing research on the ecological balance of wild horses, mule deer and mountain lions in the Inyo National Forest, that a proposed mountain lion hunt would have an extremely disruptive effect on their research. Respondents challenged the token observance in the cumulative impact analysis that the catastrophic wildfires occurring in the summer of 1987 which burned over 750,000 acres would actually result in long-term benefits to the mountain lion. Finally, respondents pointed out that the cumulative impact analysis failed to consider the impact of reasonably foreseeable future hunts on the mountain lion, its social structure, and its habitat.

In an order filed January 22, 1988, the superior court ruled that the 1987 mountain lion hunt could not proceed "until such time as [appellants] prepare[] a legally sufficient analysis of the cumulative impacts of the mountain lion hunting season . . . ." In its order, the court made certain specific rulings:

(1) A proper cumulative impact analysis must not be conclusionary; it must be supported by references to specific scientific and empirical evidence.

(2) A legally sufficient cumulative impact analysis must include data generated from meaningful research on the short-term and long-term impacts of the 1987 wildfires in California.

---

[5] In response to this argument, appellants claimed that the letters from the National Park Service were either received after their decision was adopted or were not received at all.

(3) A complete cumulative impact analysis must assume that mountain lion hunting seasons will be approved for several years after 1987. As the court reasoned, "[s]uch an assumption is necessary to analyze the potential of repeated hunting to cause genetic isolation, genetic depression, and damage to the social structure of individual populations and the statewide population . . . ."

(4) The revised cumulative impact analysis should acknowledge and discuss the potential of the hunt to impact animal populations within the national parks, the Inyo National Forest, and animal populations on other federal lands.

(5) The final cumulative impact analysis must develop more specific information on the impacts resulting from the loss of even a few individual lions on those lions' social groups.

There is no doubt the superior court concluded that these issues required substantial public input. The court's order mandates that "[b]efore a revised cumulative impacts analysis can be returned to the Court for its review, such analysis must first be circulated for further public review and commentary for a length of time sufficient to satisfy the requirements of [CEQA]." The court also ruled that all significant environmental points raised by the public had to be responded to in writing, with each response supported by scientific and empirical data. Appellants allowed this order to become final without seeking appellate review, and instead proceeded to adopt new regulations authorizing a 1988 mountain lion hunt.

On January 11, 1988, appellants issued a "Statement of Purpose for Regulatory Action" which proposed a mountain lion hunt in 1988 virtually identical to the one proposed but suspended by the superior court in 1987. A draft EID was issued on February 1, 1988, and circulated for public review. After public comment was received, a final EID was prepared and adopted. New regulations authorizing the mountain lion hunt were adopted on April 8, 1988.

Respondents immediately moved to amend the peremptory writ of mandate issued with regard to the proposed 1987 mountain lion hunt, to include the proposed 1988 hunt. Appellants initially argued that the superior court had no continuing jurisdiction over the matter because they had abandoned the 1987 hunt and started the environmental review process anew. There-

fore, they claimed, the 1988 hunting regulations constituted a completely new project, subject to independent judicial review.[6]

The superior court concluded it had continuing jurisdiction over the matter because the enactment of regulations authorizing a mountain lion hunt in 1988 merely constituted appellants' second attempt to institute the same project attempted in 1987.[7] The court then examined the draft EID which was circulated for public review, and found its cumulative impact analysis inadequate because it failed to adequately address, or to address at all, several subjects that were specified in and required by the court's earlier order. The court did not reach the question of whether the final EID, which contained more complete analysis and documentation, cured some of the defects found in the draft EID because the cumulative impact analysis in the final EID had *not* been circulated for public review. Appellants chose not to circulate the final EID for public review or draft a new cumulative impact analysis, but instead have appealed.

## DISCUSSION

Appellants contend their environmental review process with respect to the proposed 1988 mountain lion hunt fully complies with CEQA guidelines—they point out that they submitted a draft EID for public comment (Cal. Code Regs., tit. 14, § 15202, subd. (d)), comment was received (Cal. Code Regs., tit. 14, § 15105), and a final EID containing revisions based upon comments and recommendations received on the draft EID was prepared. (Cal. Code Regs., tit. 14, § 15088.) Appellants note there is no requirement under CEQA that the draft EID contain an agency's complete and final analysis of the environmental impacts of a project, and claim the court erred in gauging the adequacy of their cumulative impact analysis with reference to the draft EID alone. Appellants also question the superior court's requirement that the cumulative impact analysis contained in the final EID be subjected to public review and criticism before the adequacy of that document can be considered. They note that nothing in the CEQA guidelines requires the final EID to be circulated for public review when revisions are made in response to comments by those who oppose the project. (See Cal. Code Regs., tit. 14, § 15089, subd. (b).) In summary, appellants urge this Court to measure the environmental review process they followed in authorizing the 1988 mountain lion hunt against the requirements of CEQA and its guidelines.

---

[6] In fact, shortly after the 1988 mountain lion hunting regulations were adopted, appellants filed a complaint for declaratory relief in Sacramento County Superior Court requesting judicial approval of the 1988 mountain lion hunt. This action was dismissed at appellants' request on June 2, 1988.

[7] Appellants do not challenge this ruling on appeal.

Appellants ask us to evaluate the 1988 environmental review process in isolation from their prior attempts to get this project to pass environmental muster. The record in this case speaks for itself. In 1987 the trial court concluded that a mountain lion hunt could result in cumulatively significant impacts to the environment. After finding appellants' first cumulative impact analysis failed to meet CEQA requirements, the court pinpointed certain subjects, such as the 1987 wildfires and impacts on the national parks, that needed to be addressed. Appellants were directed that it was "not enough to make general references to 'best available scientific evidence,' 'experience,' 'observation,' or the like." Rather, appellants' conclusions "must be supported by references to specific scientific and empirical evidence . . . ." In laymen's terms, the superior court required appellants to take a "hard look" at the environmental consequences of their decision instead of setting forth bald conclusions. The seriousness with which the superior court took the requirement of public participation in this process was illustrated by the court's requirement that "[b]efore a revised cumulative impacts analysis can be returned to the Court for its review, such analysis *must first be circulated for further public review and commentary* . . . ." (Italics added.)

Given the unambiguous nature of the court's order, the draft EID that was circulated to the public to inform them of the environmental consequences of the proposed 1988 mountain lion hunt was woefully inadequate. Appellants implicitly concede the draft EID does not meaningfully address the impact of the proposed mountain lion hunt on the national parks or on research being conducted in the Inyo National Forest. On this point, the draft EID only states its conclusion that "the proposed action will not significantly affect State and federal park land uses." The wildfires California experienced in 1987 also receive cursory treatment. The draft EID merely concludes that the "accidental fires will produce benefits for lions through improved forage conditions for deer and corresponding increases in deer numbers in affected areas." This is precisely the same analysis that was rejected by the superior court in its earlier order.[8] In addressing the cumulative impacts associated with future hunts, the draft EID cites a population model used to predict long-term trends, and then states, "evaluations with the model indicate no long-term negative impacts on the local populations as a direct result of the proposed action." Unfortunately, the draft EID does not explain in even minimum detail how it arrived at this conclusion.

Thus, the draft EID circulated to the public only served to avoid important environmental considerations that were well known to appellants by

---

[8] The court's order required appellants to "include data generated from meaningful research on the probable impacts" of the 1987 wildfires. The court warned "[i]t is not enough to state that fires generally benefit deer and lions in the long run."

the time this document was drafted. Rather than squarely addressing the subjects that were set out in the court's order and submitting their environmental conclusions to public scrutiny, appellants chose to circulate a document that simply swept the serious criticisms of this project under the rug. (See *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029].) ■ ■ ■ ■ ■ It was impossible for the public, which had actively asserted a keen and sophisticated interest in the proposed mountain lion hunt, to fully participate in the assessment of the cumulative impacts associated with this project—the draft EID overlooked the significant environmental issues that had been brought to appellants' attention through the 1987 commentary process and the writ of mandate.[9]

Compliance with the writ of mandate is commanded by the principles and spirit of CEQA. The requirement of public review has been called "the strongest assurance of the adequacy of the EIR [(environmental impact report)]." (*Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813, 823 [176 Cal.Rptr. 342].) ■ "[I]t is vitally important that an EIR avoid minimizing the cumulative impacts. Rather, it must reflect a conscientious effort to provide public agencies and the general public with adequate and relevant detailed information about them. [Citation.]" *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 79 [198 Cal.Rptr. 634]. "A cumulative impact analysis which understates information concerning the severity and significance of cumulative impacts impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of project approval. [Citation.]" (*Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 431 [222 Cal.Rptr. 247].)

---

[9] We take this opportunity to express our frustration with the inadequacies of the record that has been provided by appellants for our review. The clerk's transcript omits virtually every critical exhibit that was submitted to the superior court in support of the parties' memoranda, motions and affidavits. We should not have to point out to counsel who should be well-versed in appellate procedure that the appellant has the burden of affirmatively demonstrating error by providing an adequate record. (*Santa Clara County Environmental Health Assn.* v. *County of Santa Clara* (1985) 173 Cal.App.3d 74, 83-84 [218 Cal.Rptr. 678], and cases cited therein; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 418.) A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed. Throughout their brief, respondents assail the lack of an adequate record, but nevertheless go on to make numerous arguments based upon the missing exhibits. We point out that respondents have the same obligation to insure that the record contains the matter on which they rely. Because of the intense public interest in this litigation, this court, on its own motion, has ordered up and reviewed the original superior court file. We wish to emphasize to the parties that there is no reasonable basis to believe this procedure will be followed in the future when we are provided with an inadequate record.

■ While technical perfection in a cumulative impact analysis is not required, courts have looked for "adequacy, completeness, and a good faith effort at full disclosure." (Cal. Code Regs., tit. 14, § 15151.) "A good faith effort to comply with a statute resulting in the production of information is *not* the same, however, as an absolute failure to comply resulting in the *omission* of relevant information." (*Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1022 [192 Cal.Rptr. 325].) "Only by requiring the [sponsoring agency] to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided, and only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials, thus allowing for appropriate action come election day should a majority of the voters disagree." (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].)

At the time the environmental review process was under way on the proposed 1988 mountain lion hunt, appellants were under a duty imposed by the writ of mandate to circulate a draft for public review that contained a complete discussion on certain issues, such as the probable impacts of the 1987 wildfires and the potential of the hunt to disrupt animal populations on federal lands. The decision to circulate a draft that failed to consider and adequately address these issues, as well as others, was in violation of a court order that should have been strictly followed. Consequently, we hold that appellants abused their discretion by not proceeding in a manner required by law. (See Pub. Resources Code, § 21168.5; see *Environmental Protection Information Center, Inc.* v. *Johnson, supra,* 170 Cal.App.3d at p. 614.)

We do not reach the question of whether the final EID, which was not considered by the trial court, clears up some of the deficiencies of the draft. The cumulative impact analysis contained in the final EID has never been subjected to public review and criticism. If we were to allow the deficient analysis in the draft EID to be bolstered by a document that was never circulated for public comment, we would not only be allowing appellants to follow a procedure which deviated substantially from the terms of the writ, but we would be subverting the important public purposes of CEQA. Only at the stage when the draft EID is circulated can the public and outside agencies have the opportunity to analyze a proposal and submit comment. No such right exists upon issuance of a final EID unless the project is substantially modified or new information becomes available. (See Cal. Code Regs., tit. 14, § 15162.) To evaluate the draft EID in conjunction with the final EID in this case would only countenance the practice of releasing a report for public consumption that hedges on important environmental issues while deferring a more detailed analysis to the final EID that is insulated from public review.

The EIR has been described as "an environmental 'alarm bell'" whose purpose is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return. (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) The court's review of the proposed 1987 mountain lion hunt rang the environmental alarm bell loud and clear. Appellants paid only token observance to this warning in their attempt to authorize a mountain lion hunt in 1988. Should they wish to proceed in the future with another attempt to authorize a mountain lion hunt, they must provide a cumulative impact analysis to the public that encourages rather than impedes meaningful public discussion of these important issues.

The judgment is affirmed.

Low, P. J., and Channell, J.,* concurred.

Appellants' petition for review by the Supreme Court was denied January 17, 1990.

---

* Assigned by the Chairperson of the Judicial Council.