[No. B068366. Second Dist., Div. One. July 30, 1993.]

ULTRAMAR, INC., Plaintiff and Appellant, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT, Defendant
and Appellant.

**COUNSEL**

Kaye, Scholer, Fierman, Hays & Handler, Aton Arbisser, Robert Barnes, McCutchen, Doyle, Brown & Enersen and William H. Freedman for Plaintiff and Appellant.

Latham & Watkins, David J. Hayes, Juli Wilson Marshall, Susan S. Azad, McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish and Jocelyn Niebur Thompson as Amici Curiae on behalf of Plaintiff and Appellant.

Peter Greenwald, Barbara Baird, William B. Wong, Shute, Mihaly & Weinberger, Mark I. Weinberger, Alletta d'A. Belin and Daniel P. Selmi for Defendant and Appellant.

James K. Hahn, City Attorney (Los Angeles), Vincent B. Sato, Deputy City Attorney, Kenneth L. Nelson, City Attorney (Torrance), David Nawi, County Counsel (Santa Barbara), Stephen Shane Stark and William M. Dillon, Deputy County Counsel, Lloyd Harmon, County Counsel (San Diego), Terrence Dutton, Deputy County Counsel, James B. Lindholm, Jr., County Counsel (San Luis Obispo), Raymond A. Biering, Deputy County Counsel, James L. McBride, County Counsel (Ventura), James W. Thonis, Deputy County Counsel, Alan K. Marks, County Counsel (San Bernardino), Karen K. Nowak, Deputy County Counsel, John Powell, David Schott, Burke, Williams & Sorenson, Carl K. Newton, Michael P. Kenny, and Diane Moritz Glazer as Amici Curiae on behalf of Defendant and Appellant.

**OPINION**

**MASTERSON, J.**—Ultramar, Inc., and South Coast Air Quality Management District (AQMD) each appeal from portions of a judgment. Therein,

the trial court upheld AQMD's power to issue a regulation challenged by Ultramar, but found that AQMD had violated a provision of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; hereafter CEQA) relating to a 30-day public comment period on an environmental assessment (EA). We conclude the trial court was correct in both respects and therefore affirm the judgment.

## BACKGROUND

Hydrogen fluoride (HF) is a colorless, fuming gas or liquid acid. In concentrated form, it is used by oil refineries as a catalyst in the production of high-octane gasoline. HF is a toxic air contaminant.[1] Refineries that do not use HF use sulfuric acid as a substitute.

In March 1988, AQMD formed a task force to study the hazards of HF use. The task force submitted a report to the governing board of AQMD on March 29, 1990. A summary of the minutes from the April 6, 1990, meeting of the governing board of AQMD states that the board passed a motion to adopt its staff's recommendation "that the storage and use of large quantities of HF be phased out by December 31, 1994." AQMD formulated "rule 1410" which, if adopted, would require that the use of HF be phased out over a seven-year period, and that interim mitigation measures be adopted.

Normally under CEQA, such a project, having a potentially significant effect on the environment, requires the preparation of an environmental impact report (EIR), a complicated and time-consuming process. However, an agency such as AQMD can apply to the Secretary of the Resources Agency of California to have its regulatory program certified. Once its regulatory program is certified, an agency is entitled to prepare an EA, an abbreviated environmental report, in lieu of an EIR, and is exempt from specified portions of CEQA. (Pub. Resources Code, § 21080.5, subd. (c).)

To qualify for certification, an agency's regulatory program must be governed by regulations which, inter alia, require that no project will be approved if there are feasible alternatives or mitigation measures available which would substantially lessen any adverse impact on the environment, and require that final action on any proposal include the written responses to

---

[1] Health and Safety Code section 39655, subdivision (a), states that "[a] substance that is listed as a hazardous air pollutant pursuant to subsection (b) of Section 112 of the federal act (42 U.S.C. Sec. 7412(b)) is a toxic air contaminant." 42 United States Code section 7412, in turn, identifies HF as a hazardous air pollutant.

Unless otherwise stated, all further statutory references shall be to the Health and Safety Code.

significant environmental points raised during the evaluation process. Additionally, the project plan must be made available for review and comment by other agencies and the general public. (Pub. Resources Code, § 21080.5, subd. (d); see, generally, *Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 610-611 [216 Cal.Rptr. 502].)

AQMD submitted its regulatory program to the Secretary of the Resources Agency of California, who approved it. Pursuant to this authority, AQMD's staff began preparation of an EA. When distributed, the EA would focus public discussion on the adoption of proposed rule 1410 which, as noted, would eventually ban the use of HF. On February 22, 1991, AQMD sent copies of its draft EA by Federal Express to industrial users of HF, and by regular mail to other interested members of the public. The deadline for submitting comments on the draft EA was set forth as March 25, 1991. Shortly after February 22, 1991, AQMD discovered that the chapter of the EA which discussed the cumulative environmental impacts of rule 1410 had not been sent to all interested parties. On March 1, 1991, AQMD mailed this chapter to everyone on the mailing list. However, it did not extend the deadline for the submission of comments on the draft EA, thereby effectively making the comment period less than 30 days.

On April 5, 1991, following a public hearing, the 11 members of AQMD's governing board who were present voted unanimously to adopt rule 1410. As adopted, rule 1410 prohibits oil refineries from using or storing HF after January 1, 1998, unless the physical characteristics of HF are reduced to levels specified in the rule. Additionally, rule 1410 requires that, before the phaseout date, a number of interim control measures be adopted. These measures ranged from "[m]aintain[ing HF]-sensitive paint for leak detection on all valves and flanges for pipes and vessels handling [HF]" to "[m]aintain[ing] containment systems."

On May 6, 1991, Ultramar filed a petition for writ of mandate challenging AQMD's adoption of rule 1410. In material part, Ultramar asserted that AQMD did not have the authority to adopt rule 1410, and that it had not complied with CEQA in various respects, including an alleged failure to allow a 30-day public comment period on the draft EA.

On October 8, 1991, Ultramar sought summary adjudication of its causes of action alleging AQMD's lack of authority to adopt rule 1410. AQMD responded on October 31, 1991, by filing its own summary adjudication motion directed to the same issue. On November 22, 1991, the trial court determined that AQMD "has the broad authority to adopt Rule 1410."

The balance of Ultramar's action was heard on April 22, 1992. In its statement of decision, filed June 8, 1992, the trial court found that AQMD possessed the authority to adopt rule 1410 pursuant to sections 40001, 40402, and 40440, and that the EA was legally adequate in all respects except for lack of a 30-day public comment period. As noted by the trial court, AQMD's "own guidelines, CEQA guidelines, and the [Public Resources Code] all require at least a 30-day comment period. An EA of this scope and depth should have had the widest possible exposure, particularly a chapter discussing cumulative impact."

The judgment entered on June 8, 1992, suspended rule 1410, pending a reevaluation of the rule by AQMD following at least a full 30-day public comment period. AQMD was ordered to consider and respond to any new comments raised during this comment period.

ISSUES

A. *AQMD's Appeal*

AQMD contends that (1) CEQA's 30-day period for public comment is inapplicable to rule 1410, (2) Ultramar waived its right to challenge rule 1410, and (3) the trial court's order remanding the matter for a new comment period was overbroad.

B. *Ultramar's Appeal*

Ultramar's primary contention on its appeal is that AQMD does not possess the necessary police powers to phase out preemptively the use of HF.[2]

DISCUSSION

A. *AQMD's Appeal*

1. *CEQA's 30-day Public Comment Period Is Applicable to Rule 1410*

■ Public Resources Code section 21091, subdivision (a), provides that "[t]he public review period for a draft [EIR] shall not be less than 30 days."

---

[2]Ultramar also contends that the EA "was merely an invalid, post hoc rationalization of [AQMD's] decision" to ban HF and that, overall, the EA for rule 1410 was inadequate. However, its reply brief states that if we affirm the judgment on the basis that AQMD "failed to make the draft [EA] available to the public for the required minimum of thirty (30) days," we need not reach the other issues relating to the EA. Since we affirm for AQMD's failure to comply with the 30-day period, we will not discuss the other alleged deficiencies of the EA.

The fact that this section refers to EIR's, rather than EA's, is of no consequence. We note that when certifying AQMD's regulatory program pursuant to Public Resources Code section 21080.5, the Secretary of the Resources Agency of California stated that the AQMD governing "[b]oard has adopted CEQA implementation guidelines which will apply to the review of proposed rules and will assure an interdisciplinary approach in the analysis of all significant, and potentially significant, environmental impacts which may result from these proposals." Clearly, the Secretary of the Resources Agency of California was not distinguishing between EIR's and EA's at the time AQMD's regulatory program was certified, and neither shall we.

AQMD further argues that had the Legislature intended that a 30-day review period be applicable to EA's prepared as part of certified regulatory programs, as well as for EIR's, it could have amended Public Resources Code section 21080.5 to provide for a 30-day period when it enacted Public Resources Code section 21091. Although not intended by it, AQMD's argument actually leads to the opposite conclusion. We say this for the following reasons.

"A recognized rule of statutory construction is that the expression of certain things in a statute necessarily involves exclusion of other things not expressed—*expressio unius est exclusio alterius*. [Citation.]" (*Henderson* v. *Mann Theatres Corp.* (1976) 65 Cal.App.3d 397, 403 [135 Cal.Rptr. 266].) The plain language of Public Resources Code section 21080.5, subdivision (c), which discusses the portions of CEQA from which a certified regulatory program is exempt, limits the exemption to "the provisions of Chapter 3 (commencing with Section 21100) and Chapter 4 (commencing with Section 21150) and Section 21167." Public Resources Code section 21091, which specifies a public review period of not less than 30 days, is a part of chapter 2.5. We must conclude that the Legislature's exclusion of this section from the specific list of exemptions was intentional.

Moreover, it is well settled that, in ascertaining legislative intent, interpretations of statutes which render words of a statute as surplusage are to be avoided. (*Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 455].) In order to accept AQMD's argument, we would have to ignore, and thereby nullify, the Legislature's specific list of exemptions.

As the Supreme Court recently emphasized, "[t]he foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment

within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278], quoting *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) We conclude that an interpretation of Public Resources Code section 21080.5 which contracts the public comment period would thwart the legislative intent underlying CEQA.[3]

■ Finally, AQMD's contention that CEQA's 30-day public comment period was satisfied since a complete copy of the draft EA was available for public inspection at AQMD's office for more than 30 days is without merit. By mailing copies of the draft EA to interested parties, AQMD assumed a duty to send complete copies. AQMD cannot now argue that it mailed these copies merely as a courtesy, and therefore should not be held responsible for having mailed incomplete copies. Recipients of the draft EA would naturally assume that they were being sent a complete copy. Relying on that assumption, they would have no reason to examine the draft EA at AQMD's office.

2. *Ultramar Did Not Waive Its Objection to AQMD's Noncompliance With CEQA*

AQMD asserts that Ultramar waived its right to challenge the adoption of rule 1410 since (a) it failed to exhaust its administrative remedies, (b) it rejected an extension of time within which to comment, and (c) there was no demonstration of prejudice. We reject these claims.

a. *Ultramar Exhausted Its Administrative Remedies*

■ Public Resources Code section 21177 codifies the exhaustion of administrative remedies doctrine. Subdivision (a) of that section prohibits the commencement of any proceeding to attack a project "unless the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person."

"The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review." (*Coalition for Student Action* v.

---

[3] *City of Sacramento* v. *State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960 [3 Cal.Rptr.2d 643], a case relied on by AQMD, is distinguishable. There, the Court of Appeal found that the trial court erred by issuing a writ of mandate compelling compliance with CEQA since the petitioners neither alleged nor proved that the public agency failed to comply. In contrast, Ultramar has amply demonstrated AQMD's failure to comply with CEQA, as well as AQMD's CEQA guidelines and rules.

*City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [200 Cal.Rptr. 855], original italics.)

In this case, on March 18, 1991, counsel for Ultramar sent a letter to James Lents, AQMD's executive officer. In this letter, Ultramar vigorously protested "the highly improper procedures being followed by [AQMD] in circulation of the draft [EA] for proposed Rule 1410," and requested that the public comment period be extended to at least April 3, 1991, a mere nine days.

By specifically objecting to AQMD's failure to distribute a complete copy of the draft EA and requesting that the comment period be extended for an appropriate period of time, Ultramar clearly satisfied its obligation to exhaust its administrative remedies.

 b. *Ultramar's Rejection of AQMD's Offer to Extend the Time Within Which to Comment on Chapter Six Does Not Constitute a Waiver*

AQMD argues that Ultramar should be barred from complaining that the draft EA was not circulated for a 30-day period since it rejected AQMD's offer to it of an extension.

By narrowly focusing on its offer to Ultramar, AQMD overlooks the gravity of its omission. The net effect of AQMD's action was to deprive the public of the full 30-day comment period on the EA. AQMD cannot remedy this omission merely by offering, in a private communication, an extension of the comment period to one member of the public. We conclude that no waiver occurred.[4]

 c. *There Was a Prejudicial Abuse of Discretion*

Public Resources Code section 21168.5 provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

---

[4]We note in passing that the extension of time AQMD offered to Ultramar was limited to comments on the missing chapter, rather than on the whole EA or the rule that was being considered.

AQMD asserts that neither Ultramar nor any member of the public was prejudiced by AQMD's failure to send out a complete draft EA. To support its argument, AQMD notes that none of the 35 witnesses who spoke at the public hearing "raised any question about the inadequacy of the time period for public review." A similar contention was rejected in *Environmental Protection Information Center, Inc.* v. *Johnson, supra,* 170 Cal.App.3d 604. There, the California Department of Forestry approved a proposed timber harvesting plan. Like the EA, the harvesting plan was an alternative to the preparation of a complete EIR. The Forestry Rules (former Cal. Admin. Code, tit. 14, § 895 et seq.) required that the notice of approval be issued no later than 10 days from the date of approval. Public Resources Code section 21080.5, subdivision (g), required that any lawsuit to challenge the approval be filed within 30 days of the date of approval. The California Department of Forestry failed to comply with the 10-day rule. Nonetheless, it argued that the party challenging the approval was not prejudiced, since it was able to file its suit within the 30-day period, and later secured leave to file an amended complaint. In rejecting this argument, the *Johnson* court stated:

"Full compliance with the letter of CEQA is essential to the maintenance of its important public purpose. [Citation.] Reviewing courts 'have a duty to consider the legal sufficiency of the steps taken by [administrative] agencies [citation], and we must be satisfied that these agencies have fully complied with the procedural requirements of CEQA, since only in this way can the important public purposes of CEQA be protected from subversion.' [Citation.] At least, when these provisions go to the heart of the protective measures imposed by the statute, failure to obey them is generally 'prejudicial'; to rule otherwise would be to undermine the policy in favor of the statute's strict enforcement.

". . . . . . . . . . . . . . . . . . . . . . . .

"The 10-day rule is a key regulation preserving the public's right to challenge a plan approval without the undue haste caused by [California Department of Forestry's] violation of the rule. For this reason the 10-day time limit must be enforced, without after-the-fact speculations on ephemeral possibilities of prejudice or the lack thereof." (170 Cal.App.3d at pp. 622-623, fn. omitted.)

So in this case, AQMD violated not only Public Resources Code section 21091, subdivision (a), which mandates a minimum 30-day public review period, but also its own CEQA implementation guideline 7.7(c), which states

that review periods for draft EIR's should be not less than 30 days, and its own rule 110(b), which requires publication of all staff reports, including EA's, for at least 30 days.

Furthermore, although only 12 pages of the 288-page draft EA were omitted, the missing section was an entire chapter which focused on the cumulative environmental impact of rule 1410. The significance of a truthful, complete and public dissemination of information relating to the cumulative environmental impact of a proposed project was emphasized in *Mountain Lion Coalition* v. *Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1051 [263 Cal.Rptr. 104]: "The requirement of public review has been called 'the strongest assurance of the adequacy of the EIR . . . .' [Citation.] '[I]t is vitally important that an EIR avoid minimizing the cumulative impacts. Rather, it must reflect a conscientious effort to provide public agencies and the general public with adequate and relevant detailed information about them. [Citation.]' [Citation.] 'A cumulative impact analysis which understates information concerning the severity and significance of cumulative impacts impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of project approval. [Citation.]' [Citation.]"

*Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013 [192 Cal.Rptr. 325] is also instructive on this subject. There, a public agency failed to submit a copy of its draft EIR to the Governor's Office of Planning and Research State Clearinghouse before the public agency approved a project. Under former California Administrative Code, title 14, section 15051, subdivision (b), the state clearinghouse was "responsible for distributing environmental documents to State agencies, departments, boards, and commissions for review and comment." The public agency conceded that, by approving the project before submission to the state clearinghouse, "it was unable to respond to the comments received from [the Office of Planning and Research] and other state agencies . . . ." (143 Cal.App.3d at p. 1019.) The trial court denied mandate since it concluded that the violation was not prejudicial. In reversing, the Court of Appeal stated:

"Were we to accept [the public agency's] position that a clear abuse of discretion is only prejudicial where it can be shown the result would have been different in the absence of the error, we would allow [] a subversion of the purposes of CEQA. Agencies could avoid compliance with various provisions of the law and argue that compliance would not have changed their decision. Trial courts would be obliged to evaluate the omitted information and independently determine its value. This prospect has led other

courts to recognize that a failure to proceed in the manner prescribed by law may alone be a prejudicial abuse of discretion. [Citations.] We conclude that where that failure to comply with the law results in a subversion of the purposes of CEQA by omitting information from the environmental review process, the error is prejudicial." (*Id.* at pp. 1022-1023, fn. omitted.)

As with the procedural noncompliance in *Rural*, AQMD hampered a fully informed public review of rule 1410 through its failure to circulate the cumulative effects chapter. The purposes of CEQA were thereby subverted.

We conclude AQMD's omission constituted a prejudicial abuse of discretion.

3. *The Trial Court's Order Is Not Overbroad*

Public Resources Code section 21168.9 provides, in pertinent part:

"(a) If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following:

"(1) A mandate that the determination, finding, or decision be voided by the public agency.

"(2) A mandate that the public agency and any real parties in interest suspend all activity, pursuant to the determination, finding, or decision, that could result in any change or alteration to the physical environment, until the public agency has taken such actions as may be necessary to bring the determination, finding, or decision into compliance with this division.

"(3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division."

■ Relying on *Laurel Heights Improvement Assn.* v. *Regents of University of California, supra*, 47 Cal.3d 376, AQMD argues that the trial court erred in commanding it to conduct a new 30-day public comment period on the full EA, and to "stop doing anything to implement" rule 1410. According

to AQMD, since only those individuals who did not have 30 days to comment on chapter six were harmed by its CEQA violation, the trial court should have limited its remedy for that defect by giving only those parties additional time to comment, and by permitting comments solely on chapter six.

AQMD's reliance on *Laurel Heights* is misplaced. There, a public university desired to relocate its biomedical research facility to a newly acquired building. The Supreme Court concluded that the EIR prepared by the university adequately described the potential environmental effects of the current intended uses of the facility and that substantial evidence supported the university's finding that these effects would be mitigated. However, the EIR was deficient in its discussion of the environmental effects of the university's future activities at the facility, as well as its description of alternatives to the project. In deciding whether to permit the university to continue operating at the new facility pending the certification of a legally adequate EIR, the Supreme Court held that "traditional equitable principles" should guide courts in making such a determination. (47 Cal.3d at p. 423.)

On the issue before us, we conclude that the equities do not favor AQMD. First, unlike the EIR in *Laurel Heights*, which described adequately the environmental effects of the university's current operations, the omitted portion of AQMD's EA concerned a chapter dealing with the cumulative effects of a rule which would be implemented immediately. Second, we cannot overemphasize the importance of full compliance with all notice provisions of applicable law, so that there will be maximum public comment and involvement. The enactment of a rule such as rule 1410 is a matter of great public significance. If implemented, the cost in financial terms to industry and to the public will be great.[5] If not implemented and there is an accidental release of HF, the cost in loss of life could be horrific. In the last analysis, it is not our role to decide the best course to take in the regulation of toxic air contaminants. Rather, our role is to ensure that the law is followed, so that an informed decision is made. Given the significance of whatever path is followed, any decision must be subject to full public review before its implementation.[6]

[5] In its socioeconomic impact assessment, AQMD estimated the annual control costs to implement rule 1410's interim measures to be $2.5 million, and the annual control costs of the total HF phaseout to be $25.5 million. The capital costs were estimated at $12.3 million for the interim measures, and $159.2 million for the total HF phaseout.

[6] We note in passing that it would have been highly inappropriate for the trial court to limit further public comment solely to chapter six since, as explained above, this chapter was a

### B. *Ultramar's Appeal*

AQMD Has the Authority to Adopt Rule 1410

#### a. *There Is Statutory Authority for the Adoption of Rule 1410*

■ Ultramar concedes that AQMD has the power to take action upon the actual release of an air pollutant such as HF,[7] and that it may regulate HF emissions in conjunction with the issuance of a permit. However, it attacks rule 1410 by saying that the rule is an unauthorized use of a police power AQMD does not possess. In essence, Ultramar contends that AQMD has no authority to force a company which has a permit, and is not seeking modification of that permit, to phase out its use of HF. We disagree.

The parameters of the various air pollution control districts' authority, including that of AQMD, are contained in section 40000 et seq. Section 40000 provides: "The Legislature finds and declares that local and regional authorities have the primary responsibility for control of air pollution from all sources, other than emissions from motor vehicles. The control of emissions from motor vehicles, except as otherwise provided in this division, shall be the responsibility of the state board."

As noted, the trial court concluded that sections 40001, 40402, and 40440, subdivision (a), authorized AQMD to adopt rule 1410. We find dispositive of this issue the provisions of section 40001. The language of the section in effect when rule 1410 was adopted[8] provided: "Subject to the powers and duties of the state board, the districts shall adopt and enforce rules and regulations to achieve and maintain the state and federal ambient air quality standards in all areas affected by emission sources under their jurisdiction, and shall enforce all applicable provisions of state and federal law. [¶] The rules and regulations may, and at the request of the state board shall, provide for the prevention and abatement of air pollution episodes which, at intervals, cause discomfort or health risks to, or damage to property of, a significant number of persons or class of persons."

Ultramar argues that AQMD's power to adopt rule 1410 cannot be grounded in former section 40001. It says that under that section, AQMD's

---

significant portion of the EA. (*Mountain Lion Coalition* v. *Fish & Game Com., supra,* 214 Cal.App.3d 1043; *Rural Landowners Assn.* v. *City Council, supra,* 143 Cal.App.3d 1013.)

[7] Section 39013 defines an air pollutant as "any discharge, release, or other propagation into the atmosphere and includes, but is not limited to, smoke, charred paper, dust, soot, grime, carbon, fumes, gases, odors, particulate matter, acids, or any combination thereof."

[8] Section 40001 was amended on January 1, 1993, to add a further paragraph. The effect of that amendment is discussed *post* at page 707. The language of the first two paragraphs of section 40001, in effect when rule 1410 was adopted, was not changed.

regulatory power was limited to the achievement of state and federal ambient air quality standards, that rule 1410 is irrelevant to the attainment of that goal, and that HF is not a substance to which state and federal ambient air quality standards apply (see Cal. Code Regs., tit. 17, § 70200; 42 U.S.C. former § 7412(a)(1)). This last point by Ultramar deserves amplification. Apparently, ambient air quality standards are set by the federal Environmental Protection Agency or the California Air Resources Board for various pollutants such as carbon monoxide, nitrogen dioxide and the like. These are then called, in the lingua franca of the environmental field, "criteria pollutants." Air quality standards have not been set for a host of other pollutants such as HF. Those pollutants are referred to as "non-criteria pollutants." So, the linchpin of Ultramar's argument that section 40001 does not give AQMD authority over HF is its claim that the section is restricted to so-called "criteria pollutants." We reject that proposed limitation of section 40001 as being strained and unreasonable. Our reasons are as follows.

First, Ultramar focuses only on the first paragraph of former section 40001, which deals only with AQMD's power vis-à-vis state and federal ambient air quality standards. What Ultramar fails to note is that the second paragraph of the section has no such limitation. In that second paragraph, the Legislature spoke in terms of "air pollution episodes," a subject much broader than "ambient air quality standards." Further, it is too clear for argument that "air pollution episodes" could be caused by any pollutant, such as HF, regardless of whether the pollutant is labeled "criteria" or "non-criteria." This more general subject of air pollution episodes is specifically made appropriate for AQMD's regulatory powers by that second paragraph. Moreover, such regulations were not limited to abatement. Rather, they could deal with "the *prevention* and abatement of air pollution episodes . . . ." (Italics added.) By using this language, the Legislature clearly intended to vest AQMD with the authority to adopt preemptive measures designed to prevent air pollution episodes, without discrimination as to whether they were caused by "criteria" or "non-criteria" pollutants.

Second, our interpretation that the regulatory power provided under the second paragraph of former section 40001 was broader than that provided under the first paragraph is further supported by an amendment to section 40001. Effective January 1, 1993, section 40001 was amended in the following respects: Without any change in language, the first and second paragraphs were designated as "(a)" and "(b)" respectively, and a new paragraph (c) was added. That new paragraph (c) provides: "Prior to adopting any rule or regulation to reduce criteria pollutants, a district shall determine that there is a problem that the proposed rule or regulation will alleviate and that the

rule or regulation will promote the attainment or maintenance of state or federal ambient air quality standards." If, as Ultramar contends, the second paragraph of section 40001, like the first paragraph, is concerned only with the regulation of "criteria pollutants" and "ambient air quality standards," it would have been totally unnecessary for the Legislature to have included these terms in subdivision (c). Our review of the legislative history of the amendment to section 40001 reveals that, as originally proposed, subdivision (c) did not contain these terms. A reasonable inference from this is that the Legislature perceived a difference between the scope of subdivisions (a) and (b), and intentionally contracted the scope of subdivision (c).[9]

Third, we note that in *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408 [261 Cal.Rptr. 384, 777 P.2d 157] the Supreme Court considered the issue of a district's authority to regulate air contaminants. The context in which the question was raised was whether a district could create a permit system. (*Id.* at p. 419.) In that case, a contention similar to that urged by Ultramar was made, to wit, that a district had no power to regulate substances until the State Air Resources Board had ". . . identified the substance as a toxic air contaminant and adopted a control measure for it." (*Id.* at p. 411.) The Supreme Court rejected the argument, noting that since 1983 ". . . the board has identified only nine substances as toxic air contaminants, and many years, perhaps decades, may pass before the board will be able to study, identify, and regulate the hundreds of substances discharged into the air. If board identification and regulation were a prerequisite for district control, nearly all substances would remain unregulated for the foreseeable future." (*Id.* at p. 412.) Further, the Supreme Court cited section 40001 as being one of a number of statutes giving districts such as AQMD broad regulatory powers. (*Id.* at p. 418.) The court made no reference to a district's power being limited to "criteria pollutants."

With respect to California's statutory scheme for control of air pollution, the Supreme Court has said that: "The air pollution control district is *the* agency charged with enforcing both statewide and district emission controls." (*Orange County Air Pollution Control Dist.* v. *Public Util. Com.* (1971) 4 Cal.3d 945, 948 [95 Cal.Rptr. 17, 484 P.2d 1361], original italics.) Given the importance of the role which districts such as AQMD play, we are

---

[9]At oral argument, Ultramar contended that AQMD in its regulations has interpreted the term "air pollution episodes" as used in section 40001 to refer only to "criteria pollutants." We invited supplemental briefing on the subject. Having reviewed the material supplied by Ultramar, we find nothing to support its contention that AQMD has so limited the interpretation of "air pollution episodes."

unwilling to accept the unrealistic limitation on their powers which would result if Ultramar's construction of section 40001 were accepted.[10]

### b. *Later Enacted Legislation Does Not Affect AQMD's Authority*

■ Ultramar further contends that later enacted statutes demonstrate that AQMD never had the authority to act to prevent air pollution episodes. It points to the Hazardous Materials Management Act (§ 25531 et seq., hereafter the HMMA), which requires certain businesses that handle acutely hazardous materials to adopt a "risk management and prevention program." Ultramar also references the California Oil Refinery and Chemical Plant Safety Preparedness Act of 1991 (Gov. Code, § 51020 et seq.), which, inter alia, forms a Technical Advisory Committee to study threats posed to "communities located near oil refineries and chemical plants in the event of a catastrophic release of acutely hazardous material, of fire, or of explosion." (Gov. Code, § 51023.5, subd. (b)(1).) With reference to these statutes, Ultramar argues that, "[i]f air pollution control districts had the broad regulatory powers in this area that [AQMD] claims, it seems improbable that the Legislature would have expressly given extensive duties to other public agencies while consistently and knowingly excluding the districts from all but a marginal advisory role." (Italics omitted.) This argument does no more than pose a conundrum. It may have been wise or unwise for the Legislature to have involved air pollution control districts in the matters referenced in each of these statutes. We have no way of knowing. However, the Legislature's failure to so involve the districts is not to us convincing evidence that it never empowered air pollution control districts with preemptive regulatory authority.[11] Indeed, the authorities referenced in the discussion above suggest exactly the contrary to us.

In a similar vein, amici curiae the Hydrogen Fluoride Panel of the Chemical Manufacturers Association and the California Manufacturers Association assert that, by enacting the HMMA, the Legislature intended that toxic chemicals be regulated by uniform statewide standards, thereby effectively repealing section 40001's grant of power.

The HMMA does not say that the Legislature expressly intended to preempt regulation by local air pollution control districts. We must therefore

---

[10]Since we uphold the trial court's ruling on the basis of section 40001, we need not address the other statutory bases relied on by the trial court (i.e., §§ 40402 and 40440, subd. (a)).

[11]In fact, Government Code section 51021, subdivision (c), specifically provides that "[n]othing contained in [the California Oil Refinery and Chemical Plant Safety Preparedness Act of 1991] shall be construed to grant any additional regulatory control or authority to preempt local governmental control or to amend any existing local governmental ordinance or state statute or regulation."

determine whether enactment of the HMMA constitutes an implied repeal of the power granted to AQMD under section 40001. *Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist., supra*, 49 Cal.3d 408, is controlling. As referenced, *Western Oil* involved an air pollution control district's power to create a permit system. The challenger to the district's regulation argued that former section 39660, a part of the Tanner Act (§§ 39650-39674), called upon the State Department of Health Services, in conjunction with the State Air Resources Board, to evaluate the effects of substances, other than pesticides, which are emitted into the air. From this premise, the challenger argued that the Tanner Act prohibited air pollution control districts from regulating emissions until the State Air Resources Board had acted.

The Supreme Court rejected this contention. Initially, the Supreme Court acknowledged that air pollution control districts "have long had clear statutory authority to regulate air contaminants, including the power to create permit systems." (49 Cal.3d at p. 419.) The question became whether, by adopting the Tanner Act, the Legislature intended an implied repeal of this authority. Before answering that question in the negative, the Supreme Court set forth the appropriate analytical framework as follows:

■ " '[A]ll presumptions are against a repeal by implication.' [Citation.] The presumption is strong 'where the prior act has been generally understood and acted upon.' [Citations.] The present statutes (and their predecessors) providing districts with the power to regulate nonvehicular air pollution had been in effect for many years when the Tanner Act was passed, and they had been generally understood and acted upon. [Citation.] Furthermore, courts are especially reluctant to find an implied repeal of statutes that serve an important public purpose. [Citation.] The statutes that provide the districts with regulatory authority serve a public purpose of the highest order— protection of the public health.

"The presumption against implied repeal is so strong that, 'To overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together.' [Citation.] There must be *'no possibility* of concurrent operation.' [Citation.] Courts have also noted that implied repeal should not be found unless '. . . the later provision gives *undebatable evidence* of an intent to supersede the earlier . . . .' [Citation.]" (*Id.* at pp. 419-420, original italics.)

Applying the analysis set forth in *Western Oil*, we find that nothing contained in the HMMA is "irreconcilable, clearly repugnant, and . . .

inconsistent" with the power granted by section 40001. No logical reason exists why a local air quality management district's adoption of a rule which phases out the use of a toxic air contaminant would interfere with the adoption and enforcement of a risk management and prevention program to control acutely hazardous materials accident risks. The claim of implied repeal is rejected.

Ultramar next focuses on section 42301.7. Among other things, this statute authorizes an air pollution control officer, in responding to "a reasonably foreseeable threat of a release of an air contaminant from a source within 1,000 feet of the boundary of a school that would result in a violation of Section 41700,"[12] to "issue an immediate order to prevent the release . . . pending a hearing pursuant to Section 42450 . . . ."[13]

Ultramar argues that "[s]ection 42301.7 would have been unnecessary, and its enactment superfluous, if [AQMD] already had the power to address potential, as well as actual, discharges."

Ultramar's premise that section 42301.7 would have been unnecessary had the district already possessed the authority to prevent an accidental occurrence is unsound. Section 42301.7, subdivision (c)(1), authorizes an air pollution control officer, in appropriate circumstances, to issue an order, which is effective *before* an administrative hearing, to prevent a release or mitigate the risk of a release. This power goes beyond anything which existed before the enactment of section 42301.7. In all other circumstances, whether it involves the issuance of an abatement order pursuant to section 42450 or preemptive action under section 40001, a hearing is conducted *before* the effective date of the action being considered.

Ultramar's attempt to buttress its argument with a passage contained in a letter authored by former Assembly Member Maxine Waters, urging former Governor George Deukmejian to sign the bill enacting section 42301.7, is

---

[12]Section 41700 provides, in pertinent part: "[N]o person shall discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or which endanger the comfort, repose, health, or safety of any such persons or the public, or which cause, or have a natural tendency to cause, injury or damage to business or property."

[13]Section 42450 provides, in relevant part: "The district board may, after notice and a hearing, issue an order for abatement whenever it finds that any person . . . is in violation of Section 41700 . . . or of any order, rule, or regulation prohibiting or limiting the discharge of air contaminants into the air."

unavailing.[14] "[I]t is well-settled that, in construing legislation, a court does not consider the motives or understanding of individual legislators even when it is the person who actually drafted the legislation. [Citation.]" (*No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 248, fn. omitted [242 Cal.Rptr. 37].)[15]

### c. *An Unpublished Legislative Counsel Opinion Does Not Alter Our Conclusion*

■ Finally, Ultramar relies on an opinion by the Legislative Counsel, issued January 17, 1991, which it argues is inconsistent with any claim that AQMD had the authority to phase out the use of HF before an actual release of this toxic air pollutant. In opinion No. 23061, the Legislative Counsel opined that, other than the power conferred by section 42301.7, subdivision (c)(1), discussed in the preceding section of this opinion, an air pollution control district "does not have the authority to regulate or prohibit the use of a chemical based solely on the possibility of an accidental release of that chemical." We are not persuaded by this Legislative Counsel opinion.

While opinions of the Legislative Counsel are entitled to great weight, they are not binding. (*California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].) In this instance, although various statutes were addressed in the four-page opinion, no analysis of former section 40001 was made. As we have held, this section empowered AQMD to adopt regulations designed to prevent air pollution episodes. Accordingly, our conclusion is not altered by Legislative Counsel opinion No. 23061.

### DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Ortega, J., concurred.

---

[14]In urging the necessity of section 42301.7, former Assembly Member Waters wrote that the bill "authorizes air pollution control districts to take action to prevent a release near a school. Under existing law district's [*sic*] cannot take action until after a toxic discharge has occurred."

[15]To the extent that Ultramar is arguing that the adoption of section 42301.7 repealed AQMD's authority under section 40001, we note the Legislature's explicit pronouncement in section 42301.7, subdivision (d), that "[n]othing in th[at] section limits any existing authority of any district."