47 Cal.Rptr.3d 846 (2006)
142 Cal.App.4th 656
JOY ROAD AREA FOREST AND WATERSHED ASSOCIATION, Plaintiff and Appellant,
v.
CALIFORNIA DEPARTMENT OF FORESTRY & FIRE PROTECTION, Defendant and Appellant,
Harmony Forest & Land Company, LLC., Real Party in Interest.
No. A105421.
Court of Appeal of California, First District, Division Two.
August 30, 2006.
*848 Edwin W. Wilson, Sayre & Wilson, Healdsburg, CA, for Plaintiff and Appellant Joy Road Area Forest and Watershed Association.
Bill Lockyer, Attorney General, Mary E. Hackenbracht, Senior Assistant Attorney General, John Davidson, Supervising Deputy Attorney General, Charles W. Getz, Deputy Attorney General, for Defendant and Appellant California Department of Forestry & Fire Protection.
Paul V. Carroll, Menlo Park, CA, for Amicus Curiae The Sierra Club in support of Plaintiff and Appellant Joy Road Area Forest and Watershed Association.
*847 HAERLE, J.

I. INTRODUCTION
The California Department of Forestry & Fire Protection (CDF) approved Timber Harvest Plan 219 (THP 219). Joy Road Area Forest and Watershed Association (the Association[1]) filed a petition for writ of mandate seeking to reverse approval of THP 219. The superior court granted the Association's petition. We modify the lower court's judgment in two respects, but otherwise affirm.

II. STATEMENT OF FACTS
THP 219 pertains to a heavily forested, 13-acre area located approximately two and one-half miles southwest of Occidental in Sonoma County, on a ridge top adjacent to Joy Road (the THP area). Ninety-five percent of the trees in the THP area are second-growth redwoods which are approximately 100 years old. The THP area is owned by real party in interest, Harmony Forest & Land Company, LLC (Harmony). The THP was prepared for Harmony by Scott R. Butler, a Registered *849 Professional Forester (RPF), and was submitted to CDF on June 21, 2001.
On or about June 28, 2001, CDF returned THP 219 to Butler for the stated reason that it was incomplete and failed to comply with relevant regulations governing preparation of a THP. CDF identified 35 items that Butler needed to address in the THP before it would be accepted for filing.[2] On July 2, 2001, Butler re-submitted a new THP 219.
After THP 219 was resubmitted, a "Notice of Intent to Harvest Timber" was issued to interested agencies and members of the public. The notice stated that members of the public could review or purchase a copy of the THP at CDF's Santa Rosa office and could submit comments regarding its content. The notice also stated that the earliest date THP 219 could be approved was July 18, 2001, but that it was unlikely that the THP would be approved that soon and that a "much longer period of time" would likely be available for public comment. CDF received more than 100 letters from members of the public and public officials who expressed concern about the THP.
The administrative record contains an "Official Notice of Filing of a Timber Harvesting Plan" dated July 12, 2001, which, apparently, was posted by or on behalf of CDF. The THP itself reflects a formal filing date of July 13, 2001. Over the next several months, CDF modified or replaced 37 pages in the 167 page THP. Then, on March 28, 2002, CDF approved THP 219. The approved plan authorizes the cutting of two-thirds of the redwood trees in the THP area.
On April 25, 2002, the Association filed a petition for writ of mandate A temporary restraining order and then a preliminary injunction prevented Harmony from implementing THP 219 during the pendency of the lower court proceedings. Then, on November 18, 2003, the Honorable Lawrence Antolini of the Sonoma County Superior Court granted the Association's petition on three grounds: (1) significant new information was added to THP 219 without notice to the public; (2) CDF's conclusion that implementing the THP would not significantly impact "fog drip" in the affected area was not supported by substantial evidence; and (3) there was no substantial evidence to support CDF's conclusion that future residential development was not a consideration when evaluating the potential impact of the THP. However, the court rejected the Association's contention that CDF violated requirements for the protection of the Northern Spotted Owl.
Both parties have appealed. CDF maintains that THP 219 was properly approved while the Association contends that CDF violated requirements for the protection of the Northern Spotted Owl.

III. DISCUSSION

A. Standard of Review

CDF's approval of a THP is properly reviewed pursuant to administrative mandamus. (Friends of the Old Trees v. Department of Forestry and Fire Protection (1997) 52 Cal.App.4th 1383,1392, 61 *850 Cal.Rptr.2d 297 (Friends of the Old Trees); Code Civ. Proc., § 1094.5) The issue on appeal is whether CDF prejudicially abused its discretion by either (1) making a determination which is not supported by substantial evidence; or (2) failing to proceed as required by law. (Laupheimer v. State of California (1988) 200 Cal.App.3d 440, 463-464, 246 Cal.Rptr. 82; Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection, (2004) 123 Cal.App.4th 1331, 1345, 20 Cal.Rptr.3d 808 (Ebbetts Pass).) As noted above, the superior court found that CDF committed both types of error in this case.

B. The Statutory Framework

Two statutes govern CDF's evaluation of a THP, the Z'Berg-Nejedly Forest Practice Act of 1973, Pub. Res.Code, § 4511 et seq. (the Forest Practice Act), and the California Environmental Quality Act, Pub. Res.Code, § 21000 et seq. (CEQA).[3]
"Timber harvesting operations in this state must be conducted in accordance with the provisions of the Forest Practice Act. The [Forest Practice] Act was intended to create and maintain a comprehensive system for regulating timber harvesting in order to achieve two goals: (1) to ensure that `[w]here feasible, the productivity of timberlands is restored, enhanced, and maintained'; and (2) to ensure that `[t]he goal of maximum sustained production of high-quality timber products is achieved while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, . . . and aesthetic enjoyment.' (§ 4513)" (Sierra Club v. State Bd. of Forestry (1994) 7 Cal.4th 1215, 1226, 32 Cal.Rptr.2d 19, 876 P.2d 505 (Sierra Club).)
The Forest Practice Act provides, among other things, that a specific logging operation on privately-owned timberlands cannot begin until the logger prepares and submits a THP and obtains CDF's approval thereof. (§ 4581.)
The timber harvesting industry is also subject to regulation under CEQA. (Sierra Club, supra, 7 Cal.4th at p. 1228, 32 Cal.Rptr.2d 19, 876 P.2d 505; Schoen v. Department of Forestry & Fire Protection (1997) 58 Cal.App.4th 556, 573, 68 Cal. Rptr.2d 343 (Schoen); Environmental Protection Information Center, Inc. v. Johnson (1985) 170 Cal.App.3d 604, 608, 216 Cal.Rptr. 502 (Johnson); Californians for Native Salmon etc. Association v. Department of Forestry (1990) 221 Cal.App.3d 1419, 1422, 271 Cal.Rptr. 270 (Californians for Native Salmon).)
"CEQA is a comprehensive scheme designed to provide long-term protection to the environment. [Citation.] In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted `to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (Mountain Lion Foundation v. Fish & Game Com. (1997) 16 Cal.4th 105, 112, 65 Cal.Rptr.2d 580, 939 P.2d 1280 (Mountain Lion Foundation).)
As a general rule, CEQA requires the preparation of an environmental impact report (EIR) for any project which has a potential significant effect on the environment. (§ 21000 et seq.) However, section 21080.5 of CEQA provides that a state agency can implement a regulatory program which is certified as exempt from the EIR preparation requirement when the program satisfies several criteria, including *851 the requirement of a written plan which is deemed to constitute the functional equivalent of an EIR.
The Forest Practice Act and its implementing regulations (Cal.Code Regs., tit. 14, § 895 et seq. (Forestry Rules)) is a regulatory program which has been certified as exempt from EIR preparation under section 21080.5. (Johnson, supra, 170 Cal.App.3d at p. 611, 216 Cal.Rptr. 502.) "The THP is an informational document designed to serve as an `abbreviated' [EIR], setting forth proposed measures to mitigate the logging operation's potential adverse impact on the environment. CDF and public review of the THP prior to approval is intended to ensure that the adverse environmental effects are substantially lessened, particularly by the exploration of feasible less damaging alternatives to the proposed harvesting project." (Id. at pp. 609-610, 216 Cal.Rptr. 502.)
The timber industry's exemption from EIR preparation is not a "blanket exemption to CEQA's provisions; it grants only a limited exemption to the applicability from CEQA by allowing a timber harvester to prepare a THP in lieu of a complete [EIR]." (Johnson, supra, 170 Cal.App.3d at p. 616, 216 Cal.Rptr. 502.) In approving a THP, CDF must comply not only with the provisions of the Forest Practices Act but also with "those provisions of CEQA from which it has not been specifically exempted by the Legislature." (Sierra Club, supra, 7 Cal.4th at p. 1228, 32 Cal.Rptr.2d 19, 876 P.2d 505; see also Schoen, supra, 58 Cal.App.4th at p. 573, 68 Cal.Rptr.2d 343.)

C. CEQA Notice and Recirculation Requirements

The Association contends CDF abused its discretion by approving THP 219 without complying with the notice and recirculation requirements of CEQA. (§§ 21092 and 21092.1; Cal.Code Regs, tit. 14, § 150988.5.)
Section 21092 of CEQA requires an agency to give public notice that it is preparing an EIR or negative declaration. Section 21092.1 further provides: "When significant new information is added to an [EIR] after notice has been given pursuant to Section 21092 and consultation has occurred pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again pursuant to Section 21092, and consult again pursuant to Sections 21104 and 21153 before certifying the [EIR]."
As noted in our factual summary, after notice was given that THP 219 had been submitted and filed, CDF made numerous changes to its content. For example, a four-page section of the THP entitled "Statement of Alternatives" was added on November 13, 2001. We agree with the trial court that this discussion of alternatives was "significant new information" that was added to the THP. Indeed, all regulatory programs that are exempt from the EIR preparation requirement must require that the plan or other written documentation required by their program include "a description of the proposed activity with alternatives to the activity ...." (§ 21080.5, subd. (d)(3)(A).) Furthermore, public review and comment regarding such alternatives is a crucial component of CEQA. (See Friends of the Old Trees, supra, 52 Cal.App.4th at pp. 1403-1405, 61 Cal.Rptr.2d 297; Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 404-405, 253 Cal.Rptr. 426, 764 P.2d 278; Wildlife Alive v. Chickering (1976) 18 Cal.3d 190, 197-198, 132 Cal.Rptr. 377, 553 P.2d 537.)
In its opening brief, CDF does not dispute that it added significant new information to the THP without notice or recirculation.[4] *852 Instead, it takes the position that the CEQA provisions requiring notice and recirculation do not apply to the timber industry. The thrust of CDF's argument is that its regulatory program's exemption from the requirement of EIR preparation pursuant to section 21080.5 of CEQA necessarily exempts the timber industry from complying with all provisions of CEQA which, by their terms, relate to the EIR "process."
"Under the maxim of statutory construction, expressio unius est exclusio alterius, if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary. [Citation.] CEQA is a legislative act, and the Legislature both had and retains the authority to limit the projects to which CEQA applies." (Sierra Club, supra, 7 Cal.4th at p. 1230, 32 Cal.Rptr.2d 19, 876 P.2d 505.) "The Legislature has not included timber harvesting operations within any of the classes of projects that are exempt from CEQA...." (Id. at p.1231, 32 Cal.Rptr.2d 19, 876 P.2d 505.)
As noted above, CDF has obtained a partial exemption from CEQA compliance pursuant to section 21080.5, the statute pursuant to which CDF's regulatory program was certified. However, contrary to CDF's arguments on appeal, this limited exemption does not extend to the notice and recirculation provisions at issue here.
Subdivision (c) of section 21080.5 states: "A regulatory program certified pursuant to this section is exempt from Chapter 3 (commencing with Section 21100), Chapter 4 (commencing with Section 21150), and Section 21167, except as provided in Article 2 (commencing with Section 21157) of Chapter 4.5." Our Supreme Court has expressly found that this exemption must be strictly construed and that "timber harvesting in this state is exempt only from chapters 3 and 4 of CEQA and from section 21167...." (Sierra Club, supra, 7 Cal.4th at p. 1231, 32 Cal.Rptr.2d 19, 876 P.2d 505, emphasis added.) Since sections 21092 and 21092.1 are not part of chapters 3 or 4 or of section 21167 of CEQA, certification of CDF's regulatory program does not exempt the timber industry from compliance with these important provisions. (Ibid.)[5]
CDF points out that, in order to obtain certification for its regulatory program, it was required to promulgate "guidelines for the orderly evaluation of proposed activities." (Quoting § 21080.5, subd. (d).) In CDF's view, the guidelines for evaluating THP's are simply inconsistent with guidelines applicable to the EIR "process."[6] In this regard, CDF characterizes the THP as a "dynamic document" which should not and cannot be treated as a "static" document like a draft EIR.
CDF's "we can't comply with CEQA" argument has three permutations. First, *853 CDF claims it cannot comply with provisions which reference either the EIR or any other document generated in conjunction with an EIR because a proposed timber harvest is evaluated by reviewing a THP rather than an EIR. This perceived barrier to compliance with CEQA is easily overcome by simply construing statutory references to EIR's as also referring to THP's.
Second, CDF highlights differences regarding the method of giving public notice required by CEQA with the notice method tailored to suit the timber industry which is set forth in the Forest Practice Act. For example, CEQA requires that notice of the filing of an EIR be published (§ 21092, subd. (b)(3)(A)) or posted for thirty days. (§ 21092.3). The Forest Practice Act, by contrast, requires mailed notice to interested parties but does not require publication. (§ 4582.3; Forestry Rules, § 1037.1 & 1037.3.) CDF does not explain, however, how these distinctions between the two statutes prevent CDF from complying with the substantive CEQA requirement at issue in this case, i.e., that when significant new information is added to an environmental report, the public and interested parties are entitled to notice of that new information and the opportunity to comment thereon.
Finally, CDF suggests that, because public inspection and review of a proposed THP are specifically addressed in sections 4582.6 and 4582.7 of the Forest Practice Act, these statutes take precedence over what CDF characterizes as "the generic and general requirements for draft environmental impact report comments found in Public Resources Code sections 21092 and 21092.1...." Again, though, CDF fails to articulate how complying with these Forest Practice Act provisions precludes it from also complying with CEQA's notice and re-circulation requirements.[7]
As this court has held in the past, CEQA and the Forest Practice Act "are not in conflict, but rather supplement each other and, therefore, must be harmonized." (Natural Resources Defense Council, Inc. v. Arcata Nat. Corp. (1976) 59 Cal.App.3d 959, 965, 131 Cal.Rptr. 172 NRDC).) Indeed, courts have long recognized the "well-defined relationship between the Forest Practice Act and CEQA." (Friends of the Old Trees, supra, 52 Cal.App.4th at p. 1393, 61 Cal.Rptr.2d 297.) "CEQA and its substantive criteria for the evaluation of a proposed project's environmental impact apply to the timber harvesting industry, and are deemed part of the [Forest Practice Act] and the Forestry Rules." (Johnson, supra, 170 Cal.App.3d at pp. 617, 620, 216 Cal.Rptr. 502.) Thus, the process by which THP's are approved must "conform not only to the detailed and exhaustive provisions of the [Forest Practice] Act, but also to those provisions of CEQA from which it has not been specifically exempted by the Legislature." (Sier a Club, supra, 7 Cal.4th at p. 1228, 32 Cal.Rptr.2d 19, 876 P.2d 505.)
CDF contends that, because the THP is routinely amended during the review process, CEQA's notice and recirculation requirements are simply too burdensome. Initially, we note that CDF is in the best position to manage this burden as it controls the procedure pursuant to which amendments are made. In any event, the perceived burden of complying with CEQA under these circumstances is outweighed by the important policy goals advanced by these statutory provisions. "Public review *854 is essential to CEQA. The purpose of requiring public review is `"`to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.'" [Citation.]' [Citation.] Public review permits accountability and `"informed self-government."' [Citation.]" (Schoen, supra, 58 Cal.App.4th at pp. 573-574, 68 Cal.Rptr.2d 343.) "[P]ublic review and comment . . . ensures that appropriate alternatives and mitigation measures are considered, and permits input from agencies with expertise in timber resources and conservation." (Hewlett v. Squaw Valley Ski Corp. (1997) 54 Cal.App.4th 499, 525, 63 Cal.Rptr.2d 118, superseded on other grounds as stated in United Farm Workers of America v. Dutra Farms (2000) 83 Cal.App.4th 1146, 1163-1164, 100 Cal.Rptr.2d 251.) "CEQA broadly invokes the policy of permitting full public participation throughout the environmental review process it commands. [Citations.]" (Plaggmier v. City of San Jose (1980) 101 Cal.App.3d 842, 854, 161 Cal.Rptr. 886.)
CDF contends that Forest Practice Act procedures ensure meaningful public review. It emphasizes that, during the period that a THP is being amended, it is subject to public review and inspection in the public file in accordance with the requirements of the Forest Practices Act and Forestry Rules. (See § 4582.6; Forestry Rules § 1037.3.) Further, during this review period, CDF invites the public and public agencies to comment on the THP. (See § 4582.6, subd. (b).)
We are not persuaded that the procedure CDF describes ensures meaningful public review and comment. If an interested party reviews and/or obtains a copy of the THP before CDF substantively alters it, and that party is thereafter not notified of the change, then he or she has been denied a meaningful opportunity to review and comment on the THP. Absent notice that CDF has made a substantive change or even that it has the right to make such a change, we question why a member of the public should be expected to anticipate such a change. Further, if the THP is routinely significantly altered by CDF during the review period, then the THP that CDF ultimately approves is essentially a different plan than that which the property owner submitted. The notice and recirculation provisions of CEQA ensure that the public has notice and an opportunity to comment on the actual plan that CDF intends to approve.
Even if CDF were to notify the public that it could and likely would substantively amend a THP during the review process, we would question CDF's claim that meaningful public participation could be assured simply by placing a copy of the ever-changing THP in a public file. In our view, placing the onus on members of the public to repeatedly review a lengthy THP and determine for themselves what changes CDF has made to it is simply inconsistent with the fundamental policy goals of CEQA.
Although we find no case directly on point, our conclusion is consistent with Ultramar, Inc. v. South Coast Air Quality Management Dist. (1993) 17 Cal.App.4th 689, 21 Cal.Rptr.2d 608 (Ultramar), a case holding that a certified regulatory program must comply with section 21091, CEQA's 30-day public comment requirement.[8] At issue in Ultramar was the validity of a rule adopted by the South Coast Air Quality Management District (AQMD) requiring that the use of Hydrogen Fluoride (HF) be phased out over a seven-year period. (Ultramar, supra, 17 Cal.App.4th at pp. 696-697, 21 Cal.Rptr.2d 608.) The *855 Ultramar court found AQMD had authority to issue the HF rule but held the regulation was invalid because AQMD failed to comply with CEQA's 30-day notice provision.
Like CDF, AQMD's regulatory program was certified. Therefore, AQMD prepared an "EA," an abbreviated environmental report, in lieu of an EIR, as part of its procedure for adopting the HF rule. (Ultramar, supra, 17 Cal.App.4th at p. 696, 21 Cal.Rptr.2d 608.) The draft EA was circulated to industrial users of HF and other interested members of the public and a deadline for submitting comments on the draft was set for March 25, 1991. Shortly thereafter, AQMD discovered that a chapter of the EA addressing the cumulative environmental impacts of the proposed HF rule was not sent to all interested parties. AQMD then mailed the relevant chapter to everyone on the mailing list but it did not extend the deadline for submitting comments, "thereby effectively making the comment period less than 30 days." (Id. at p. 697, 21 Cal.Rptr.2d 608.)
The Ultramar court affirmed a trial court ruling that AQMD violated CEQA by failing to comply with the 30-day public comment period requirement set forth in section 21091. (Ultramar, supra, 17 Cal.App.4th at pp. 698-699, 21 Cal.Rptr.2d 608.) In reaching this conclusion, the court rejected AQMD's argument that it was exempt from complying with section 21091 pursuant to section 21080.5. Like other courts that have addressed the section 21080.5 exemption, the Ultramar court concluded that a certified regulatory program is exempt from only chapters 3 and 4 and section 21167 of CEQA. Noting that section 21091 is part of chapter 2.5, the Ultramar court concluded that AQMD was not exempt from complying with this 30-day public comment requirement. Indeed, the court recognized that "an interpretation of . . . section 21080.5 which contracts the public comment period would thwart the legislative intent underlying CEQA." (Id. at p. 700, 21 Cal.Rptr.2d 608.)
The Ultramar court was guided in part by a recent pronouncement by our Supreme Court that "`[t]he foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language."' [Citations.]" (Ultramar, supra, 17 Cal.App.4th at pp. 699-700, 21 Cal.Rptr.2d 608, quoting Laurel Heights, supra, 47 Cal.3d at p. 390, 253 Cal.Rptr. 426, 764 P.2d 278.) This principle applies equally in the case before us and supports our conclusion that CDF is not exempt from the notice and recirculation provisions of CEQA.
Finally we note that, although the argument CDF presents to us in this case is novel, it is premised on a legal theory which has been soundly rejected. The appellate courts of this state have repeatedly advised CDF that CEQA applies to the timber harvesting industry and that the process CDF uses to evaluate and approve THP's must comport with all provisions of CEQA except for chapters 3 and 4 and section 21167. (See Gallegos v. State Bd. of Forestry (1978) 76 Cal.App.3d 945, 953-954, 142 Cal.Rptr. 86; Johnson, supra, 170 Cal.App.3d 604, 614-620, 216 Cal.Rptr. 502; Friends of the Old Trees, supra, 52 Cal.App.4th 1383, 1392-1394, 61 Cal.Rptr.2d 297.) Indeed, this court has so held on more than one occasion. (See NRDC, supra, 59 Cal.App.3d at pp. 965-966, 131 Cal.Rptr. 172; Schoen, supra, 58 Cal.App.4th at pp. 565-566, 573, 68 Cal. Rptr.2d 343.) Our Supreme Court has also expressly agreed with this position. (Sierra Club, supra, 7 Cal.4th at pp. 1228-1231, 32 Cal.Rptr.2d 19, 876 P.2d 505.) Nevertheless, CDF has continued to resist *856 complying with CEQA by advancing increasingly contorted interpretations of settled law. We urge CDF to heed the law as consistently interpreted by the courts of this state, and to commit its time and resources toward the more productive end of conforming its "process" to comply with CEQA.
We affirm the trial court's finding that CDF abused its discretion by failing to proceed in the manner required by law when it approved THP 219. We also find that the error was prejudicial. When CDF fails to comply with mandatory procedures, prejudice is presumed. (Ebbetts Pass, supra, 123 Cal.App.4th at p. 1345, 20 Cal.Rptr.3d 808.) Furthermore, although CDF fails to squarely address this issue, we reject its suggestion that the volume of public comment generated by THP 219 is evidence, in and of itself, that the public had an adequate opportunity to review this THP. In our view, the significant public interest in this case is a strong indication that the failure to comply with CEQA's notice and recirculation requirements was prejudicial.[9]

D. Fog Drip

Fog drip is "a process in which trees capture moisture from fog, which then drips to the forest floor." (Friends of the Old Trees, supra, 52 Cal.App.4th at p.1398, 61 Cal.Rptr.2d 297.) The trial court found there was insufficient evidence to support CDF's conclusion that the proposed timber harvest will not have a significant adverse effect on the water supply by reducing fog drip in the THP area.[10] CDF disagrees.

1. Background

THP 219 addresses the effect of the proposed harvest on fog drip in section IV of the THP which contains a "Cumulative Impacts Assessment." There, the THP states: "While there may be a slight reduction in fog drip (water input) as a result of this operation, it is not expected to be significant. No significant decrease in water yield is expected from a decrease in fog drip. Decreases in evapotranspiration (water output through the removal of trees) and the associated increase in water availability, will significantly offset any decrease in fog drip. It is estimated that less than 50% of the shade canopy of the harvest area will be removed."
Fog drip is also addressed in a report prepared by the Division of Mines & Geology, who participated in a preharvest inspection relating to THP 219. That report states, in part: "The proposed timber harvesting will somewhat reduce interception, evaporation and transpiration of precipitation, and may reduce fog drip, but because the larger trees on the upper slopes are retained, reduction in fog drip is anticipated to be very minor. Based on studies by the USDA Forest Service at Caspar Creek in Mendocino County, selective harvesting will probably result in a minor increase in summer flows and total water yield (Keppeler, 1998), and moisture savings due to reduced evapotranspiration will override any fog precipitation losses."
*857 The fog drip issue also generated significant public comment. In this court, the Association highlights two comments as particularly significant.
First, Carl Wahl, who resides near the THP area, wrote a long letter which was supplemented with references and exhibits, about the contribution of fog drip to the water supply in the THP area. Wahl expressly challenged the conclusion expressed in THP 219 that any reduction in fog drip would be offset by moisture savings due to decreased evapotranspiration and he cited various reports and studies to support his contrary conclusion. Wahl maintained that fog drip was a significant source of water and that the proposed removal of 67% of the total basal area of redwood trees would have a severe deleterious effect on the water supply in the THP area.
Wahl's conclusions were echoed in a letter by Dr. Daniel Wickham.[11] Dr. Wickham estimated that the proposed logging of redwoods in the THP area would result in the loss of 4.3 million gallons of water from fog drip during a typical summer. According to Wickham, "[f]og precipitation is the only water source available during [the summer], and there can be no doubt that a reduction in ground water recharge of this scale is significant and warrants an immediate rejection of this THP."
CDF expressed its views regarding fog drip in its "Official Response To Significant Environmental Points Raised During The Timber Harvesting Plan Evaluation Process" (official response). An official response is a written response to significant environmental objections that have been raised by the public during the review process which CDF must prepare in connection with its approval of a THP. (See Johnson, supra, 170 Cal.App.3d at p. 621, 216 Cal.Rptr. 502; § 4582.6; Forestry Rules § 1037.8.).[12]
In its official response, CDF acknowledged that the THP area is a "water poor" area but concluded that the impact of the proposed harvest on fog drip would not adversely affect the water supply for several reasons. For one, CDF questioned whether fog drip significantly recharges groundwater. In this regard, it identified two studies supporting a conclusion that most of the water captured by fog drip is reabsorbed by the trees themselves as well as vegetation in the surrounding area. CDF also reasoned that the effect on fog drip in the general area would not be significant because, among other things, the THP area was small in size and a significant portion of the canopy would be retained including big trees on the upper slope. Furthermore, even within the THP area, there would not be a significant reduction of fog drip because the proposed harvest did not involve clear-cutting, a method which has been identified as adversely affecting fog drip. Here, a significant number of remaining trees and vegetation would be available to provide fog drip within the THP area.

*858 2. Analysis

Initially, we note there is no dispute between the parties that both CEQA and the Forest Practice Act require that a THP include a cumulative impact analysis. (See Johnson, supra, 170 Cal.App.3d at p. 625, 216 Cal.Rptr. 502; § 21083, subd. (b); Schoen, supra, 58 Cal.App.4th at pp. 567-569, 68 Cal.Rptr.2d 343; Forestry Rules, § 912.9.) Nor is there any dispute that the cumulative impact analysis for THP 219 needed to address the potential impact of the proposed plan on the water supply generally and on fog drip in particular.
In any event, we find that, in addressing the fog drip issue, the parties (and the trial court) have conflated two distinct issues, first, whether THP 219 contains a sufficient cumulative impact analysis of the fog drip issue and, second, whether CDF's ultimate conclusion, set forth in its official response, that there will be no significant adverse impact on fog drip is supported by substantial evidence. We will separately consider these two issues.
"[T]he substantive CEQA requirement of assessing cumulative environmental impact must be included in the evaluation of each THP by CDF. [Citation.] `[C]umulative damage [is] as a whole greater than the sum of its parts.' [Citation.] The cumulative impact of past, present and future logging activities is `a substantive criterion for the evaluation of the environmental impact' of a proposed timber harvest. [Citation.]" (Californians for Native Salmon, supra, 221 Cal.App.3d at p. 1423, 271 Cal.Rptr. 270.)
Furthermore, the cumulative impact analysis must be substantively meaningful. "`A cumulative impact analysis which understates information concerning the severity and significance of cumulative impacts impedes meaningful public discussion and skews the decisionmaker's perspective concerning the environmental consequences of the project, the necessity for mitigation measures, and the appropriateness of project approval. [Citation.]' [Citation.] [¶] While technical perfection in a cumulative impact analysis is not required, courts have looked for `adequacy, completeness, and a good faith effort at full disclosure.' [Citation.]" (Mountain Lion Coalition v. Fish & Game Com. (1989) 214 Cal.App.3d 1043, 1051, 263 Cal.Rptr. 104 (Mountain Lion Coalition).)
In the present case, the trial court expressed the view that the THP's cumulative impact analysis regarding fog drip was "a mere opinion utterly lacking in facts or even a brief explanation as to why there will be only a de minimis loss in fog drip [and] water supplies." We agree. In light of the overwhelming concern about this issue expressed in the public comments and the significant evidence produced by interested citizens to support their contention that fog drip significantly contributes to the groundwater supply in the THP area, we find that the cumulative impact analysis regarding this issue was woefully inadequate. No facts, statistics, reports or studies are identified to support the contention that the decrease in fog drip will not result in a decrease in the water supply.
By approving a THP which contained an inadequate cumulative impact analysis regarding an admittedly important environmental issue, CDF failed to proceed in a manner required by law and prejudicially abused its discretion. "`Only by requiring the [sponsoring agency] to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided, and only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials, thus allowing for appropriate action come election day should a majority of the voters disagree.' [Citation.]" (Mountain Lion Coalition, *859 supra, 214 Cal.App.3d at p. 1052, 263 Cal.Rptr. 104.)
However, the question of whether CDF's ultimate conclusion regarding fog drip is supported by substantial evidence is an entirely different issue. "Substantial evidence means `enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citations.] Substantial evidence includes facts, reasonable assumptions based on fact, and expert opinion supported by facts. On the other hand, `arguments, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous [is not substantial evidence].' [Citation.]" (Friends of the Old Trees, supra, 52 Cal.App.4th at p. 1397, fn. 8, 61 Cal.Rptr.2d 297.)
In this case, CDF's official response contains a lengthy substantive discussion of the fog drip issue which addresses the arguments and concerns voiced by members of the public and sets forth the reasoning behind CDF's conclusion that the impact on fog drip will not significantly adversely affect the water supply in or around the THP area. That discussion references relevant reports and studies, including those relied on by concerned citizens who commented on this subject. In addition, CDF relies on the report by the Division of Mines and its conclusion that the effect on fog drip would not be significant.[13] Whether or not we agree with CDF's interpretation of the cited reports or with the conclusions its draws therefrom, substantial evidence support's CDF's ultimate determination that the potential adverse impact of the plan on fog drip will not be significant.
The Association resists this conclusion by arguing that we must disregard evidence set forth for the first time in CDF's official response. To support this contention, it relies on Friends of the Old Trees, supra, 52 Cal.App.4th at p 1402, 61 Cal. Rptr.2d 297. In Friends of the Old Trees, a panel of Division Five of this court affirmed a trial court finding that CDF abused its discretion by approving a THP which did not contain necessary information regarding cumulative impacts. CDF argued, among other things that "the general topic of cumulative impacts and the specific topic of water supply and fog drip were adequately addressed in [CDF's] official written response to public comments." (Id. at pp. 1401-1402, 61 Cal.Rptr.2d 297.) The court rejected this contention and found that CDF could not rely on information which appeared in the official response as opposed to the THP itself. The court reasoned that the official response "was not prepared as part of the THP that was available for public comment but was only issued after the THP had been approved. (See [Forestry Rules] § 1037.8.)" It further reasoned that, "[]n pursuing an approach that `releas[es] a report for public consumption that hedges on important environmental considerations while deferring a more detailed analysis to [a report] that is insulated from public review' [CDF] pursued a path condemned as inconsistent with the purpose of CEQA ... [citation]. Certainly, the Department cannot expect the public's access to information after the fact to substitute for the opportunity to influence the Department's decisions before *860 they are made." (Id. at p. 1402, 61 Cal.Rptr.2d 297.)
Contrary to the Association's contention on appeal, Friends of the Old Trees does not preclude us from considering CDF's official response when evaluating whether there is substantial evidence to support CDF's conclusion in this case regarding the impact of the proposed harvest on fog drip and water supply in the THP area. In contrast to the case before us, the THP at issue in Friends of the Old Trees did not contain any cumulative impact analysis and the court declined to fill that unacceptable gap in the plan with information contained in the official response. Here, by contrast, we have already addressed the inadequacy of the THP as an informational document and are now considering the separate and different question of whether CDF's conclusion about fog drip is supported by substantial evidence.
The official response is "a keystone to the public's participation in the approval process, and an important element in the public's right to prepare and file a challenge" to an approval of a THP. (Johnson, supra, 170 Cal.App.3d at p. 622 & fn. 10, 216 Cal.Rptr. 502.) "This response will obviously be of crucial assistance in the evaluation of any potential lawsuit, and in the structuring of arguments, pleading allegations and prayers for relief. The sufficiency of the response may itself be a ground on which to challenge the decision of approval." (Id. at p. 623, 216 Cal.Rptr. 502; see Gallegos v. State Bd. of Forestry, supra, 76 Cal.App.3d at pp. 952-953, 142 Cal.Rptr. 86; Society for California Archaeology v. County of Butte (1977) 65 Cal.App.3d 832, 839-840, 135 Cal.Rptr. 679.) In other words, the function of the official response is to set forth CDF's evidence in support of its conclusions. (See, e.g., Ebbetts Pass, supra, 123 Cal.App.4th 1331, 20 Cal.Rptr.3d 808.) In light of this purpose, it is inappropriate for us to ignore the official response when called upon to determine whether a particular conclusion is supported by substantial evidence.
To summarize and clarify, we hold that the error regarding the fog drip issue in this case was not that CDF's ultimate decision lacks substantial evidence but, rather, that THP 219 contains an inadequate cumulative impact analysis with regard to the issue of fog drip.

E. Future Development

The cumulative impact section of THP 219 does not address the impact of potential future housing development in the THP area for the stated reason that future housing development is speculative. The parties disagree as to whether CDF abused its discretion by approving this THP notwithstanding its failure to consider the cumulative impact of future housing development.

1. Background

The THP states that "[t]he landowner purchased this property for the purpose of harvesting and building a residence" and reiterates that the landowner's "intent" is "to harvest trees and build a residence." The THP also discloses that "[t]he property is presently divided into 3 lots. By definition of county ordinances these lots may have a residence built on them if they meet county requirements. The previous landowner applied for lot line adjustment to meet some of the county requirements in order to apply for building permits. This application by the previous landowner is on hold with the county." The THP also acknowledges that the present owner has expressed the desire to build a residence on the property and that he or she "may or may not" request a lot line adjustment.
As noted above, THP 219 does not evaluate the cumulative impact of future building development. However, the cumulative *861 impact section of the THP does include two brief comments regarding this issue: "The property covered by this THP contains 3 separate parcels. It is the desire of the landowner to build a home on two of the parcels. If the landowner can meet [zoning ordinance criteria], and desires at some future time to build on these permitted locations, he may...." This section of the THP also states that the "propose[d] landing locations planned for this THP could be used as future building sites."

2. Analysis

In order to comply with CEQA, a THP must "`consider all significant environmental impacts ... regardless whether those impacts may be expected to fall on or off the logging site, and regardless whether those impacts would be attributable solely to activities described in the timber harvesting plan or to those activities in combination with other circumstances including but not necessarily limited to other past, present, and reasonably expectable future activities in the relevant area.'" (Friends of the Old Trees, supra, 52 Cal.App.4th at p. 1401, 61 Cal.Rptr.2d 297, italics omitted.) A future activity must be addressed as part of a cumulative impact analysis if: "(1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (Laurel Heights, supra, 47 Cal.3d at p. 396, 253 Cal.Rptr. 426, 764 P.2d 278.)
The record before us demonstrates that future housing development is a reasonably foreseeable consequence of this proposed timber harvest. Any objective reading of the evidence disclosed in this THP establishes that future development of housing in the THP area is not only a reasonable possibility, it is a primary impetus for the proposed harvest. In light of this evidence, we reject CDF's unreasonable characterization of future housing development as a speculative future proposal and its contention that the environmental effects of future housing development were too speculative to require consideration in the THP itself.
We also reject CDF's contention that it adequately addressed the potential cumulative impact of future housing development in its official response. As discussed above, the official response, which is not subject to public review or comment until after an approval decision has been made, cannot be utilized to fill gaps in the THP itself. (Friends of the Old Trees, supra, 52 Cal.App.4th at p. 1387, 61 Cal.Rptr.2d 297.)
CDF abused its discretion by approving THP 219 notwithstanding the absence of a cumulative impact analysis addressing the impact of future housing development in the THP area.

F. Protection of Northern Spotted Owls

The final issue presented to us is whether CDF complied with provisions for the protection of the Northern Spotted Owl (NSO). The Association has filed its own appeal pursuant to which it argues that (1) information about the NSO that was added to the THP during the review process constituted significant new information and (2) CDF failed to proceed in a manner required by law by approving the THP notwithstanding that a crucial study regarding the effect on NSO had not been completed.

1. Background

The NSO is a threatened specie under the federal Endangered Species Act (16 U.S.C. § 1531). "Prevent[ing] the elimination of fish or wildlife species due to man's activities" is an important policy of goal of CEQA. (See § 21001, subd. (c).) The Forest *862 Practice Act also seeks to ensure the protection of wildlife during timber harvesting activity. (See § 4551.) Consistent with this goal, CDF implemented rules "designed to minimize the chances that timber harvesting activities would result in a `taking' of the [NSO] in violation of the federal Endangered Species Act." (Public Resources Protection Assn. v. Department of Forestry & Fire Protection (1994) 7 Cal.4th 111, 117-118, 27 Cal.Rptr.2d 11, 865 P.2d 728.) In fact, CDF is required to disapprove a THP if "[i]mplementation of the plan as proposed would result in the taking of an individual Northern Spotted Owl prohibited by the Federal Endangered Species Act." (Forestry Rules, § 898.2, subd (f)).
The Forestry Rules provide that if a proposed timber harvest is located in the range of the NSO, a THP must contain certain information which "shall be used by the Director to evaluate whether or not the proposed activity would result in the `take' of an individual northern spotted owl." (Forestry Rules, § 919.9 (rule 919.9). Rule 919.9 sets forth several alternative procedures a plan submitter may elect from in order to provide the requisite information for evaluating the potential effect of the THP on the NSO. (Rule 919.9, subds. (a)-(g).)
In the present case, Harmony and Scott Butler elected to follow the procedure set forth in subdivision (e) of rule 919.9 which states: "If the submitter proposes to proceed pursuant to the outcome of a discussion with the U.S. Fish and Wildlife Service, the submitter shall submit a letter prepared by the RPF that the described or proposed management prescription is acceptable to the USFWS."
THP 219 states: "Spotted owl habitat exists within this THP, efforts taken to protect the spotted owl are covered under the spotted owl consultation with the USF & WS [United States Fish and Wildlife Services], see attached consultation package in section VI of the THP. Spotted owls have been called for the past three years, no evidence has been found. A consultation with the USF & WS is attached."
The "consultation" with the USF & WS that appears in this record reflects that USF & WS was consulted several times regarding the potential impact of the proposed harvest on the NSO. As CDF concedes on appeal, the information regarding the NSO that was originally provided in THP 219 was erroneous, and had to be altered. (RB at 5.)
In a letter dated June 25, 2001, USF & WS stated there were no known NSO activity centers located within 1,000 feet of the THP area and advised that the "Service has determined that operations conducted on the above THP would not be likely to incidentally take[14] [NSO's], provided operations are complete prior to February 1, 2002."
A letter from USF & WS dated September 28, 2001, which was issued in response to another request for technical assistance, stated, in part: "There are no known [NSO] activity centers located within 1,000 feet of the THP; however there is one known activity center within 1.3 miles with a home range that is reported to contain only 1, 269 acres of suitable habitat prior to this proposed harvest. The Service has determined that operations conducted on the above THP would not be likely to incidentally take [NSO's], provided the proposed operations retain a stand with a minimum of 40 percent canopy closure comprised of trees at least 11 inches DBH, *863 and operations are complete prior to February 1, 2002."
Both of these letters from USF & WS were sent directly to CDF and were incorporated into THP 219. Also incorporated into the THP was a November 27, 2001, e-mail response from USF & WS to another inquiry from CDF which stated: "In response to your request the Service considers both identified NSO activity centers to be active at this time. We have not seen a 0.7 mile habitat analysis around the second activity center, but the analysis around the first identified center shows it is deficient in habitat. Our last (Sept. 28, 2001) letter indicates that there can be no further loss of suitable habitat within 0.7 miles of this activity center and avoid the likelihood of incidental take. However, there have not been any recorded detections from either site for some time. I have recommended to Mr. Butler that he resurvey the sites to protocol in the Spring of 2002 and based on the results we will then determine the status of the sites and report such in a subsequent letter of technical assistance. Hope this clarifies the situation for you. Good luck."
THP 219 states: "All operations must be completed by 2-01-02 under the TA letter. Operations after this date must have a new TA letter approved by USF & WS prior to their startup. [¶] The person who submitted the original plan, or the successor in interest will submit subsequent consultations or letters of technical assistance to the Department as enforceable amendments to the plan prior to operations being conducted pursuant to that consultation or letter of technical assistance."

2. Analysis

As noted above, the Association contends that the additional information about NSO activity in the THP area that was added during the review process constituted significant new information requiring notice and recirculation pursuant to sections 21092 and 21092.1 of CEQA. CDF's sole response is that it was not required to comply with these CEQA provisions. We have already rejected this erroneous contention.
We agree with the Association that the additional information about the NSO that was added to THP 219 during the review process was sufficiently significant to merit notice and recirculation. The correspondence from USF & WS that was incorporated into the THP tracks the significant changes in the information about NSO activity in the THP area that CDF received during its review process including, in particular, that there are two activity centers potentially affected by the proposed harvest at issue in this case. It is undisputed that this information was not included in the original THP which erroneously stated that no activity centers were located in the THP area.
The Association's second contention is that CDF abused its discretion by approving THP 219 even though a "crucial" study regarding the presence of NSO in the THP area would not be conducted until after the plan was approved. CDF disagrees and maintains that it actually afforded more protection to the NSO by requiring an updated survey regarding NSO activity closer to the time the proposed timber harvest would actually occur. Although we applaud CDF's effort to afford more protection than required to the NSO, both CDF and the Association have overlooked a more fundamental problem with the way the NSO evaluation was conducted in this case.
CDF's own regulation required an approval of the project by USF & WS before CDF could approve THP 219. (See rule 919.9, subd. (e).) However, the record demonstrates that USF & WS consistently conditioned its approval of the proposed *864 management prescription on completion of the harvest by February 1, 2002. After that date, therefore, there was no approval from USF & WS. Accordingly, when CDF approved this THP on March 28, 2002, there was no letter establishing that the plan was then acceptable to the USF & WS.
Approving this THP notwithstanding the absence of a currently-effective approval by USF & WS constituted an abuse of discretion.[15]

IV. DISPOSITION
The judgment is remanded to the trial court with directions to modify its order in two respects: First, to note that there is substantial evidence to support CDF's ultimate finding regarding the effect of fog drip but that evidence does not "cure" the defect in the THP itself which failed to adequately address this issue; and, second, to note that CDF abused its discretion by failing to comply with CEQA's notice and recirculation requirements after adding significant new information to the THP about the NSO and by failing to follow its own regulations for protecting this endangered specie. In all other respects, the judgment of the superior court issuing a peremptory writ of mandate compelling CDF to rescind its approval of THP 219 is affirmed.
We concur: KLINE, P.J., and RICHMAN, J.
NOTES
[1] The Association describes itself as an "organization of persons who are dedicated to the protection of Northern California watersheds, their forests, and biological resources through lawful and environmentally sensitive forestry practices, especially those located in the Joy Road Area."
[2] CDF's letter notes, among other things, that Butler previously submitted a similar plan for this same property on behalf of a different owner which was subsequently withdrawn. CDF advised that outstanding issues regarding the previous plan were among the matters that needed to be addressed in this THP.

CDF's characterization of this THP as a "rather routine" proposed harvest is belied by several facts including that THP 219 is a resubmission of a plan that failed to garner approval, that CDF refused to accept THP 219 the first time it was submitted, and that the review process at issue here was notably long.
[3] Undesignated statutory references are to the Public Resources Code.
[4] In its reply brief CDF argues, for the first time, that even if the CEQA notice and recirculation provisions do apply, CDF did not violate them. We ignore this untimely argument.
[5] Not only does CDF ignore Sierra Club, it mischaracterizes, or at least seriously misconstrues, another Supreme Court opinion, Mountain Lion Foundation, supra, 16 Cal.4th at p. 132, 65 Cal.Rptr.2d 580, 939 P.2d 1280. CDF maintains that this case "dictate[s]" that "as long as the functional equivalent program[']s requirements and regulations are followed, CEQA's process simply does not apply." We find nothing in the cited authority to support this broad proposition.
[6] To the extent CDF is attempting to categorize CEQA's notice and recirculation provisions as non-substantive procedural guidelines, we disagree. (See Californians for Native Salmon, supra, 221 Cal.App.3d at pp. 1422-1423, 271 Cal.Rptr. 270 [recognizing that CEQA notice requirements are important substantive provisions].)
[7] For future reference, even if CDF were to identify an actual substantive conflict between these two statutes, it would not thereby free itself of its obligation to comply with CEQA. That obligation, at least in our view, requires CDF to ensure that its procedure conforms with CEQA.
[8] Section 21091 provides, in part: "The public review period for a draft environmental impact report may not be less than 30 days." (§ 21091, subd. (a).)
[9] This conclusion makes it unnecessary for us to assess the prejudicial effect of the other errors that occurred in this case.
[10] The Association contends the lower court also made a distinct finding that there was insufficient evidence that the proposed harvest plan will not adversely affect the local water supply. In fact, though, the only aspect of the discussion of water resources which the court found was not supported by substantial evidence was the specific conclusion regarding the effect on fog drip. Indeed, the trial court expressly found that the Association failed to "demonstrate that substantial information did not support the conclusion regarding water resources, aside from the specific issue of fog drip."
[11] Dr. Wickham's views regarding fog drip and its contributions to the water table were extensively discussed and essentially adopted by the majority of the court in Friends of the Old Trees, supra, 52 Cal.App.4th at p. 1400, 61 Cal.Rptr.2d 297.
[12] By addressing fog drip in its official response, CDF essentially acknowledged that the public input regarding this issue constituted a significant environmental objection to the THP. (See Forestry Rules § 1037.8 [director must provide a written response to significant environmental issues raised during the evaluation process]; Friends of the Old Trees, supra, 52 Cal.App.4th at p. 1402, 61 Cal.Rptr.2d 297 [fact that issue was addressed at length in CDF's written response to public comment "comes very close to acknowledging that the public, in fact, had raised a `fair argument'" that proposed harvest might have "significant environmental impact."].)
[13] The parties disagree as to the relevance of the report by the Division of Mines. CDF contends that this Division of Mines report was part of the public file "months before the close of the public comment period," that it constitutes CDF's views regarding fog drip, and that the public had ample time to consider and comment on these views. The Association disputes this claim. It contends that this report was not available for public review or comment. Neither party cites evidence in the record to support their contentions.
[14] "`Take' means to harass harm, pursue, hunt, shoot wound, kill, trap, capture, collect or to attempt to engage in any such conduct with regard to a federally listed species." (Forestry Rules, § 895.1.)
[15] CDF spends considerable time attempting to convince us that its rules for the protection of the NSO were "tacitly" approved by our Supreme Court in Public Resources Protection Assn. v. Department of Forestry & Fire Protection, supra, 7 Cal.4th at page 123, 27 Cal. Rptr.2d 11, 865 P.2d 728. This argument misses the mark because, as explained above, CDF did not comply with its own rules.