Filed 5/14/24  Marjorie R. v. Medeiros CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARJORIE R.,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARIO MEDEIROS,<br><br>        Defendant and Appellant. | A168121<br><br>(Sonoma County<br>Super. Ct. No. SCV-272820) |

In this dispute between members of a multi-generational family, the superior court issued a restraining order requested by Marjorie R. under the Elder Abuse and Dependent Adult Civil Protection Act (Elder Abuse Act; Welf. & Inst. Code,[1] § 15600 et seq.).  The restraining order prohibited Marjorie R.'s son-in-law, Mario Medeiros, from engaging in abusive conduct toward her; ordered him to move out and stay away from the family home; and restricted his possession of firearms.  On appeal, Medeiros argues that the restraining order was not supported by substantial evidence.  He also

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

raises a host of constitutional claims, alleging violations of due process, the First Amendment, and the Second Amendment. We affirm.

## I. BACKGROUND

On March 10, 2023, Marjorie R.—age 83 and representing herself—filed a request under the Elder Abuse Act for a restraining order against Medeiros, who rented a room in her house. Marjorie R. declared she was emotionally harmed by two acts of abuse and asked for an order requiring Medeiros to stay away from her, to have no contact with her, to move out of the family home, to not intimidate, molest, threaten, harass, or otherwise disturb her, and to not otherwise disturb her peace. She stated she did not know whether Medeiros owned or possessed firearms. She reported he had threatened her in the home which she owns and where she resides. She requested a temporary restraining order pending the hearing, explaining that she had not told him about her request because she "believe[d] that he might retaliate and become angry."

With respect to the most recent act of abuse, Marjorie R. stated she was sitting in her recliner in her living room around 8:00 p.m., and Medeiros was sitting at the kitchen counter eating dinner. After she told Medeiros that "he needed to please fix the broken pipe outside," Medeiros walked to her chair, got really red in the face, started waving his hands in the air and stated: " 'You fucking old bitch, I'm not fixing shit, you[']re nothing but a fucking bitch and I[']m sick of you. All you do is believe everyone else[']s opinions about me. You just sit here in your wheelchair all day & we take care of you and I[']m not doing shit for you anymore Bitch.' " Then, while inching closer to her face and almost touching it with his pointed finger, he cursed at her and declared: " 'We shouldn't of even brought home food for you from the hall you bitch.' " Medeiros repeated, " 'You[']re nothing but an old fucking bitch.' "

2

After Marjorie R. told Medeiros to get out of her house and "never look back," Medeiros responded: " 'I[']m taking Mary [Marjorie R.'s daughter] with me then & you'll have no one to take care of you, you old bitch.' " Medeiros then began walking down the hall to his bedroom, and Marjorie R. told him to have a "good night" and to "get out." Medeiros turned around and came back to the foot of Marjorie R.'s recliner, yelling: " 'Fuck you bitch, I[']m the only big guy here who does anything.' " He turned around again, walked into his bedroom, and slammed the door. Mary then got up from the kitchen counter and followed Medeiros into the bedroom.

The second incident of abuse occurred four or five months earlier when Medeiros got upset with his son's partner and her children for playing with his dog. After the partner went into the house to tell Marjorie R. what was going on, Medeiros followed and yelled at her, " '[T]his is a family matter and you need to get the fuck out bitch.' " According to Marjorie R., the partner stayed put because she did not trust Medeiros and his temper around Marjorie R. Medeiros continued to argue that the house was his home, and he was the only one who did anything there. When Marjorie R. stated she did not trust Medeiros and did not want him around anymore, Medeiros got red in the face and got "real close" up near her face, yelling: " 'You[']re nothing but and old Fucking bitch and your grandson is nothing but a piece of shit who just tells you lies about me.' " The partner yelled back at Medeiros to "get out" of Marjorie R.'s face and leave the house, and he began "getting into her face" and yelling, " 'Fuck you bitch.' " The partner called the police, and Mary kept yelling at Medeiros to " 'shut up and just stop fighting with everyone.' " He would stop for a second and then continue yelling " 'Fuck you, Fuck this, Fuck her,' " and it "went on and on" until the police arrived and

took him outside to calm down.  A report regarding the incident was on file with the police along with several other domestic calls to the home.

The superior court partially granted Marjorie R.'s request for a temporary restraining order, mandating that Medeiros have only "peaceful contact" with Marjorie R.  It denied the stay-away and move-out requests pending the hearing.  Medeiros was served with the petition and temporary restraining order on March 17, 2023.  He filed a response on March 30, 2023, stating he did not agree with the requested orders, and he did not own or control any firearms.  Medeiros explained that his wife Mary had been having seizures since she was an infant, and he was the only one who could drive her to/from work and perform other necessary errands.  He agreed he would keep his distance from Marjorie R. and not communicate with her.  Medeiros also noted he would like to have no communication with his son or his son's partner.

After a hearing at which both parties testified, the court issued a one-year restraining order as requested by Marjorie R.  In addition to the peaceful contact order, Medeiros was ordered to move out in one week, required to stay at least 100 yards away from Marjorie R. and the family home, and restricted from owning or possessing any firearms.  This appeal followed.

## II.  DISCUSSION

### A.    *Possible Mootness and Limited Appellate Record*

Preliminarily, we address several overarching issues impacting this appeal.  First, Marjorie R. did not file a respondent's brief.  Instead of treating the failure as a "default" (i.e., an admission of error), however, we independently examine the record and reverse only if prejudicial error is found.  (*Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1203, citing *In re*

4

*Bryce C.* (1995) 12 Cal.4th 226, 232–233; accord, *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334; see also Cal. Rules of Court, rule 8.220, subd. (a)(2) [if the respondent fails to file a respondent's brief, "the court may decide the appeal on the record, the opening brief, and any oral argument by the appellant"].)

Second, as Medeiros concedes, the instant restraining order expired on April 7, 2024, and thus this appeal is technically moot. (See *City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1079 [" 'If relief granted by the trial court is temporal, and if the relief granted expires before an appeal can be heard, then an appeal by the adverse party is moot.' "].) Medeiros asserts that we should nevertheless consider the merits of his claims because they raise important statutory and constitutional issues. He further argues that, given the short duration of civil harassment restraining orders generally, they often present issues capable of repetition yet evading review.

Under the circumstances presented, we exercise our discretion to consider Medeiros's claims on the merits. " '[T]here are three discretionary exceptions to the rules regarding mootness: (1) when the case presents an issue of broad public interest that is likely to recur [citation]; (2) when there may be a recurrence of the controversy between the parties [citation]; and (3) when a material question remains for the court's determination.' " (*Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, 144; see also *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 495–496 [claims involving civil harassment restraining order under Code of Civ. Proc. § 527.6 considered on merits because the issues raised were important and likely to recur]; accord, *Malatka v. Helm* (2010) 188 Cal.App.4th 1074, 1088.) Given representations from appellate counsel that Medeiros planned to move back into the family home upon

expiration of the restraining order, it is possible that the controversy may recur between the parties. Moreover, several of Medeiros's claims present important issues that may recur.

Thirdly, even though we will review Medeiros's claims on the merits, our review is hampered by the limited nature of the record provided. " 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent.' " (*Rossiter v. Benoit* (1979) 88 Cal.App.3d 706, 712.) Moreover, "the appellant has the burden of affirmatively demonstrating error by providing an adequate record." (*Mountain Lion v. Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1051, fn. 9.) Thus, " '[f]ailure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609 (*Jameson*).)

Here, Medeiros has failed to provide either a reporter's transcript or a settled statement describing the hearing at which he and Marjorie R. testified and after which the superior court issued the restraining order under review. (See Cal. Rules of Court, rule 8.137(a) [a settled statement "is a summary of the superior court proceedings approved by the superior court" and can be used where the proceedings were not reported by a court reporter].) Thus, although we will consider the merits of Medeiros's arguments as best we can, we arguably would be justified in simply dismissing the appeal. (See, e.g., *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186–187 [citing cases and noting that numerous appellate courts "have refused to reach the merits of an appellant's claims because no reporter's transcript of a pertinent proceeding or a suitable substitute was provided"].)

6

***B.*** *Sufficiency of the Evidence*

### 1. Legal Framework and Standard of Review

The Elder Abuse Act permits a superior court to issue a protective order "for the purpose of preventing a recurrence of abuse, if a declaration shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse of the petitioning elder." (§ 15657.03, subd. (c).) An "elder" is defined as a California resident, age 65 years or older. (§ 15610.27.) "Abuse of an elder" includes "[p]hysical abuse, neglect, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental suffering." (§ 15610.07, subd. (a)(1).) This case involves allegations of treatment causing mental suffering. "Mental suffering" is defined in relevant part as "fear, agitation, confusion, severe depression, or other forms of serious emotional distress that is brought about by forms of intimidating behavior, threats, [or] harassment." (§ 15610.53.)

Upon a sufficient showing, the court may issue a protective order "enjoining a party from abusing, intimidating, molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning . . . , contacting, either directly or indirectly, by mail or otherwise, or coming within a specified distance of, or disturbing the peace of, the petitioner. (§ 15657.03, subd. (b)(5)(A).) In addition, after notice and hearing, the court may issue "an order excluding a person from a residence or dwelling if the court finds that physical or emotional harm would otherwise result to the petitioner." (*Id.*, subd. (h).) A superior court makes findings in this context based on a preponderance of the evidence standard. (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1140 (*Bookout*).) A restraining order may be issued based on a single act of abuse and does not require any showing that

7

the wrongful act(s) will be continued or repeated.  (§ 15657.03, subd. (c); *Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.)

Issuance of a protective order under the Elder Abuse Act is reviewed for abuse of discretion, and the factual findings necessary to support such a protective order are reviewed under the substantial evidence test.  (*Bookout*, *supra*, 155 Cal.App.4th at p. 1137.)  Thus, "[w]e resolve all conflicts in the evidence in favor of respondent, the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings.  [Citation.]  Declarations favoring the prevailing party's contentions are deemed to establish the facts stated in the declarations, as well as all facts which may reasonably be inferred from the declarations; if there is a substantial conflict in the facts included in the competing declarations, the trial court's determination of the controverted facts will not be disturbed on appeal."  (*Id.* at pp. 1137–1138.)

"In reviewing the issuance of a restraining order, we will only find an abuse of discretion when the trial court exceeds the bounds of reason or disregards the uncontradicted evidence.  The party challenging the issuance of the order bears the burden of showing an abuse of discretion by the trial court."  (*Bookout*, *supra*, 155 Cal.App.4th at p. 1140.)  However, whether the facts found, when construed most favorably to respondent, are legally sufficient to support issuance of protective orders under the Elder Abuse Act is a question of law which we review de novo.  (See *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188 ["existence or nonexistence of substantial evidence is a question of law"].)

## 2.    **Substantial Evidence Supports the Restraining Order**

Medeiros contends that substantial evidence did not support the restraining order in this case because the two reported incidents—four or five

8

months apart—during which he used inappropriate language when speaking to Marjorie R. do not rise to the level of unlawful conduct causing "mental suffering" within the meaning of the Elder Abuse Act. He reasons that a "reasonable person must expect to suffer and submit to some inconveniences and annoyances from their family members." We are unconvinced.

In support of his claim, Medeiros cites *Schild v. Rubin* (1991) 232 Cal.App.3d 755 for the proposition that "[a] reasonable person must realize that complete emotional tranquility is seldom attainable, and some degree of transitory emotional distress is the natural consequence of living among other people in an urban or suburban environment." (*Id.* at p. 763.) The appellate court made this statement in the context of concluding that the sounds of basketball playing by a neighbor were insufficient to justify issuance of a civil harassment restraining order under Code of Civil Procedure section 527.6, which expressly requires that "the course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress." (Code Civ. Pro., § 527.6, subd. (b)(3) [defining harassment].) *Schild* is thus obviously distinguishable from this case.

Medeiros also contends that " ' "[m]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" ' do not constitute extreme and outrageous conduct" necessary to support a cause of action for intentional infliction of emotional distress. (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 597, disapproved on another ground in *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012, fn. 2.) He suggests Marjorie R. "should be expected to endure offensive language and insults from her son-in-law." We disagree. The Elder Abuse Act requires only reasonable proof of an act of abuse. (§ 15657.03, subd. (c).) And, as set forth above, abuse of an elder does not require "outrageous conduct" but is

9

defined more broadly to include "treatment with resulting physical harm or pain or mental suffering." (§ 15610.07, subd. (a).) The legislature, when enacting the Elder Abuse Act, expressly found that this state has a responsibility to protect elders; elders are more subject to risks of abuse; and that most elders "who are at the greatest risk of abuse, neglect, or abandonment by their families or caretakers suffer physical impairments and other poor health that place them in a dependent and vulnerable position." (§ 15600, subds. (a), (c) & (d).)

In the end, all of Medeiros's arguments in this context fail because he refuses to acknowledge that elders are uniquely entitled to protection. He also ignores that his conduct went far beyond mere offensive language and that Marjorie R. was in a dependent and vulnerable position, as she was 83 and wheelchair bound at the time of the incidents.

Although we do not have the parties' testimony before us, we can infer that the court found Marjorie R. credible. And Marjorie R.'s petition is sufficient to support the court's protective orders as it contains substantial evidence of Medeiros's past acts toward her, which can fairly be characterized as abusive, threatening, and harassing behavior resulting in mental suffering and emotional harm. (§§15610.07, subd. (a), 15610.53.) Those acts included Medeiros invading Marjorie R.'s physical space when she was unable to retreat; waving his hands and pointing his finger in her face while angry; impliedly threatening to withhold food from her; and explicitly threatening that he would take Mary away so that Marjorie R. would have no one to care for her. In addition, the police were called and intervened. It is also reasonable to infer from Marjorie R.'s petition that other family members viewed his behavior as abusive and/or threatening and that it had been necessary to call the police on several other occasions due to his conduct.

10

Substantial evidence supports the conclusion that Medeiros's intimidating and threatening behavior caused Marjorie R. fear and serious emotional distress. (§ 15610.53.)

## C.      *First Amendment Arguments*

Medeiros next raises several First Amendment challenges. Given the state of the record in this case, Medeiros cannot establish that he raised these constitutional arguments in the superior court, and he has thus forfeited them on appeal. (*San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 579 (*Geoffrey S.*) ["In both criminal and civil cases, a constitutional claim is generally forfeited by the failure to assert it in the trial court."].) We nevertheless briefly address his challenges and conclude they lack merit. Our review is de novo. (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 890 [" 'the reviewing court must " 'examine for [itself] the statements in issue and the circumstances under which they were made to see . . .whether they are of a character which the principles of the First Amendment . . . protect' " ' "].)

Medeiros first asserts that his comments to Marjorie R., even if offensive, are entitled to First Amendment protection because he did not make threats or use fighting words. The First Amendment, he urges, prohibits the government from proscribing a citizen's speech even if it is very offensive or hateful. As Medeiros acknowledges, however, " 'The United States Supreme Court has "long recognized that not all speech is of equal First Amendment importance. It is speech on ' "matters of public concern" ' that is 'at the heart of the First Amendment's protection.' [Citations.]" [Citation.] . . . 'In contrast, speech on matters of purely private concern'—while 'not totally unprotected'—'is of less First Amendment concern.' [Citation.] When such speech—for example, as in defamation or the

11

intentional infliction of emotional distress—causes damage, civil sanctions may be imposed because ' "[t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press" ' " ' " (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1228, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003.)  Moreover, the First Amendment does not protect speech that has been adjudicated as unlawful or in violation of a specific statutory prohibition. "[O]nce a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting the repetition, perpetuation or continuation of that practice is not a prohibited 'prior restraint' of speech."  (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 140 (plur. opn. of George, C.J.)  In addition, "[v]iolence and threats of violence . . . fall  outside the protection of the First Amendment because they coerce by unlawful *conduct*, rather than persuade by expression, and thus play no part in the 'marketplace of ideas.'  As such, they are punishable because of the state's interest in protecting individuals from the fear of violence, the disruption fear engenders and the possibility the threatened violence will occur."  (*In re M.S.* (1995) 10 Cal.4th 698, 714.)

Thus, in *Brekke v. Wills* (2005) 125 Cal.App.4th 1400 (*Brekke*), the appellate court concluded that the superior court "properly considered the defendant's speech in determining whether to issue injunctive relief pursuant to Code of Civil Procedure section 527.6. [(involving civil harassment restraining orders)]." (*Id.* at p. 1409.)  Specifically, the appellate court concluded that the defendant "engaged in a course of conduct directed at [the] plaintiff that seriously alarmed, annoyed, and harassed her; that would cause a reasonable person to suffer substantial emotional distress; and that

12

actually caused plaintiff to suffer substantial emotional distress. (Code Civ. Proc., § 527.6, subd. (b).)" (*Brekke*, at p. 1404.) The defendant's claim that the injunction violated his First Amendment rights was "[u]tterly without merit" as "[h]is speech—which was used to annoy, ridicule, and threaten plaintiff—was entitled to no protection because it was between purely private parties, about purely private parties, and on matters of purely private interest." (*Ibid.*)

Likewise, here we have already concluded that Medeiros's conduct directed at Marjorie R.—including his offensive speech and express and implied threats—was abusive, threatening, and harassing behavior resulting in mental suffering and emotional harm sufficient to support issuance of an elder abuse restraining order under section 15657.03, subdivision (c). Moreover, the offensive speech took place between purely private parties, about purely private parties, and on matters of purely private interest for the purpose of annoying, ridiculing, and threatening Marjorie R. Under such circumstances, Medeiros's claim that the restraining order somehow violated his First Amendment free speech rights is "[u]tterly without merit." (*Brekke*, *supra*, 125 Cal.App.4th at p. 1404.)

Medeiros also contends that the restraining order violated his First Amendment rights because it was overbroad. He notes that he was not entitled to speak to Marjorie R. for *any* reason or in *any* manner and complains that he was not able to visit his wife or the other members of his family in the family home. Moreover, his wife was required to walk 100 yards to/from the family home to be picked up/dropped off by Medeiros. According to Medeiros, the superior court did not consider family dynamics or the family's living situation when it issued the restraining order, which should have been more narrowly tailored. We disagree, as the composition of

13

the family and its living situation was squarely before the court.  Moreover, while the restraining order no doubt impacted his free speech and associational rights, the question is whether the restrictions were more than were reasonably necessary to protect Marjorie R. from abusive mental suffering.  We conclude they were not.  Under the Elder Abuse Act, the court was permitted to issue restraining orders "for the purpose of preventing a recurrence of abuse" and could issue "an order excluding a person from a residence or dwelling" if it found that "physical or emotional harm would otherwise result to the petitioner."  (§ 15657.03, subds. (c), (h).)  Substantial evidence supports the conclusion that the no-contact and move-out orders were necessary to protect Marjorie R. from further abuse.

## D.    *No Second Amendment Violation*

Citing the Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*) and the Fifth Circuit's more-recent opinion in *United States v. Rahimi* (5th Cir. 2023) 61 F.4th 443 (en banc), cert. granted June 30, 2023, No. 22-915, ___ U.S. ___ [143 S.Ct. 2688] (*Rahimi*), Medeiros next argues that the firearm prohibition issued in conjunction with the restraining order in this case violated his Second Amendment right to bear arms.  As Medeiros acknowledges, section 15657.03, subdivision (u)(1) mandates the inclusion of a firearm prohibition in any elder abuse restraining order.  He argues that this statute is unconstitutional both facially and as applied.

To begin with, we do not consider Medeiros's "as-applied" challenge to the firearms restriction.  An as-applied challenge seeks " 'relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or

14

ordinance has been applied.' " (*In re D.L.* (2023) 93 Cal.App.5th 144, 157 (*D.L.*).) Given the state of the record before us, we cannot determine whether Medeiros objected on this basis in the superior court, and he has therefore forfeited this claim. (*People v. Patton* (2019) 41 Cal.App.5th 934, 946 (*Patton*) ["An as-applied constitutional challenge is forfeited unless previously raised."].) Moreover, while we recognize that we have some discretion at the appellate level to address otherwise forfeited constitutional claims, an as-applied challenge asserts a "constitutional defect [that] may be correctable only by examining factual findings in the record or remanding to the trial court for further findings." (*In re Sheena K.* (2007) 40 Cal.4th 875, 887 (*Sheena K.*).) It is therefore not appropriately considered for the first time on appeal.

Medeiros has also forfeited his facial challenge to section 15657.03, subdivision (u)(1). (*Geoffrey S.*, *supra*, 86 Cal.App.5th at p. 579.) However, were we to reach the issue on appeal, we would find it without merit. In *District of Columbia v. Heller* (2008) 554 U.S. 570, 635 (*Heller*), the United States Supreme Court identified a constitutionally protected right to possession of handguns in the home based on the Second Amendment. In doing so, Justice Scalia opined that the Second Amendment "surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home." (*Ibid.*, italics added.) *Heller* went on to reaffirm the constitutionality of many "longstanding" and "presumptively lawful" regulatory restrictions on the right to bear arms, including (non-exhaustively) prohibitions on the possession of firearms by felons and the mentally ill, the carrying of firearms in "sensitive places" such as schools and government buildings, and laws "imposing conditions and qualifications on

15

the commercial sale of arms." (*Heller*, at pp. 626–627 & fn. 26; see also *D.L., supra*, 93 Cal.App.5th at p. 151.)

The Supreme Court's more recent opinion addressing the Second Amendment, *Bruen, supra*, 597 U.S. 1, characterized *Heller* as recognizing that "the Second and Fourteenth Amendments protect the right of an *ordinary, law-abiding citizen* to possess a handgun in the home for self-defense" before going on to recognize "that *ordinary, law-abiding citizens* have a similar right to carry handguns publicly for their self-defense. (*Bruen*, at pp. 9–10, italics added.) Further, *Bruen* did not disturb the non-exhaustive list of "presumptively lawful regulatory measures" identified in *Heller*. As Justice Alito explained in his concurring opinion, the Court's holding in *Bruen* "decides nothing about who may lawfully possess a firearm," nor has it "disturbed anything that [was] said in *Heller* . . . about restrictions that may be imposed on the possession or carrying of guns." (*Bruen*, at p. 72 (conc. opn. of Alito, J.).) Similarly, Justice Kavanaugh underscored in his concurring opinion that Supreme Court precedent, including *Heller*, has established "the Second Amendment 'is neither a regulatory straitjacket nor a regulatory blank check. . . . Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (*Bruen*, at p. 80 (conc. opn. of Kavanaugh, J.), citing *Heller, supra*, 554 U.S. at p. 636.)

We acknowledge that the Fifth Circuit recently held that 18 U.S.C. section 922(g)(8)—which prohibits certain individuals subject to domestic violence restraining orders from possessing guns—is unconstitutional in light of *Bruen*. (*Rahimi*, 61 F.4th 443.) There, the Fifth District opined that "*Heller* simply uses 'law-abiding, responsible citizens' as shorthand in explaining that its holding (that the amendment codifies an individual right to keep and bear arms) should not 'be taken to cast doubt on longstanding

16

prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." (*Rahimi*, at 452.) It then went on to conclude that there was nothing within the "Nation's historical tradition of firearm regulation" sufficient to justify firearm restrictions for an individual subject to a domestic violence restraining order. (*Id.* at 452–453.) As mentioned above, the United States Supreme Court is currently considering the propriety of this decision.

In contrast, our own Fourth District (pre-*Bruen*) upheld a similar firearm restriction contained in the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) against a Second Amendment challenge. The appellate court concluded that prohibiting firearm possession in the domestic violence context was "analogous to a prohibition on felon weapon possession, a type of restriction expressly listed by *Heller* as untouched by its holding." (*Altafulla v. Ervin* (2015) 238 Cal.App.4th 571, 581 (*Altafulla*).) Recently, the Fourth District reaffirmed *Altafulla*'s holding in *Zachary H. v. Teri A.* (2023) 96 Cal.App.5th 1136 (*Zachary H.*), concluding that "*Bruen*, which reaffirmed *Heller*'s guarantee of the right of 'law-abiding responsible citizens' to possess firearms, does not compel a different result." (*Bruen, supra*, 597 U.S. at p. 26.) In *Bruen*, the court held that New York's public-carry licensing scheme violated the Second Amendment because "it prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." [(*Bruen*, at p. 71.)]" (*Zachary H.,* at p. 1144.) Thus, *Bruen* did not "call into question the lawfulness of firearms restrictions imposed on individuals subject to restraining orders." (*Zachary H.,* at p. 1144.)

The same reasoning extends here to the firearm restriction in section 15657.03, subdivision (u)(1). As *Rahimi* acknowledges, a citizen may forfeit

17

his or her Second Amendment rights if their conduct "ran afoul of a 'lawful regulatory measure[]' 'prohibiting . . . the possession of firearms,' *Heller*, 554 U.S. at 626-27 & 627 n.26, that is consistent with 'the historical tradition that delimits the outer bounds of the right to keep and bear arms, *Bruen*, 142 S. Ct. at 2127. The question turns on whether [the statute] falls within that historical tradition, or outside of it." (*Rahimi*, 61 F.4th at 454–455.) As stated above, the *Rahimi* court concluded that there was nothing sufficiently analogous in our historical tradition of firearm regulation to justify firearm restrictions for an individual subject to a domestic violence restraining order. (*Id*. at 452–453.) We disagree.

*Heller* recognized that disarming felons or the mentally ill falls within "longstanding" and "presumptively lawful" regulatory restrictions on the right to bear arms because of the danger they potentially pose. (*Heller*, *supra*, 554 U.S. at pp. 626–627.) Disarming those who have been restrained under the Elder Abuse Act is at least analogous, if not more justified, given the abusive or intimidating behavior they have been found to have directed toward a particular person. In sum, we decline to follow *Rahimi*, and instead follow *Altafulla* and *Zachary H*. in concluding that no Second Amendment violation occurred here given the historical tradition permitting regulatory restrictions on firearm possession with respect to  dangerous and/or irresponsible citizens. (See *People v. Williams* (2013) 56 Cal.4th 630, 668 [federal court of appeal decisions are not binding on California courts].)

## E.    *Due Process Challenge*

As a final matter, Medeiros challenges the restraining order proceedings in this case on due process grounds. Specifically, he notes that the local rules of court in Sonoma County state that court reporters will

18

generally not be provided in civil matters and that use of electronic recording is in the court's discretion. Where a party has filed a fee waiver in an action, however, a court reporter is provided upon request. (Sonoma County Local Rules of Court, rules 3.1-3.4; see also Cal. Rules of Court, rule 2.956(c).) The gist of Medeiros's argument is that in civil restraining order matters—where the vast majority of litigants are unrepresented and unfamiliar with the law and court procedures—due process requires both that the court inform the litigants of the process for obtaining a court reporter and provide a written statement summarizing the facts and the legal basis for its decision to aid in appellate review.

Limited though the record is in this case, it does confirm that Medeiros was given notice and an opportunity to be heard before the issuance of the restraining order. We decline to consider Medeiros's specific procedural due process claims, however, because the record is devoid of facts essential to our analysis. It is possible, for example, that the court did advise the parties about the availability of court reporters/electronic recording and Medeiros did not request that the proceedings be recorded. Similarly, the court may have orally explained to the parties the reasons for its decision and/or Medeiros may have waived a written statement. While we understand the difficulties on appeal in cases where no reporter's transcript or other record of proceedings has been prepared, appellate counsel could have obtained a settled statement addressing these issues and declined to do so. We will not consider constitutional claims with potentially far-reaching consequences in a case where no actual controversy may even exist. (See *Sheena K.*, *supra*, 40 Cal.4th at p. 887 [inappropriate to consider as-applied constitutional challenge for the first time on appeal]; *Patton*, *supra*, 41 Cal.App.5th at

19

p. 946 [as-applied constitutional challenge is forfeited unless previously raised].)

## III.  DISPOSITION

The judgment of the superior court is affirmed.  Each party shall bear their own costs on appeal.

HUMES, P. J.

WE CONCUR:

LANGHORNE, WILSON, J.

BANKE, J.

*Marjorie R. v. Medeiros;* A168121